**UNITED STATES of America**

v.

**Joseph M. LENA, Defendant.**

**Crim. No. 79–213.**

United States District Court,
W. D. Pennsylvania,
Criminal Division.

Sept. 26, 1980.

Jeffrey Manning, U. S. Asst. Atty., Pittsburgh, Pa., for plaintiff.

Richard Galloway, Greensburg, Pa., for defendant.

## ORDER AND OPINION

SIMMONS, District Judge.

The defendant, Joseph Lena, was tried before a jury and was convicted on two counts of extorting money from architectural firms in connection with the construction of two school buildings, in violation of Title 18, United States Code Section 1951.

The matter is now before this Court on defendant's Motion for a New Trial and Motion in Arrest of Judgment. Defendant's Motion for a New Trial asserts twelve (12) reasons why a new trial should be granted, while the Motion in Arrest of Judgment asserts four (4) reasons why the verdict should be set aside, judgment arrested and the defendant discharged. This case involved two (2) counts of alleged violations of Title 18, United States Code, Section 1951.

The first count of the indictment charges that the defendant unlawfully and willfully obstructed, delayed and affected interstate commerce by attempting to and attaining an alleged sum of $8,000.00 from Donald G. Williams and Edmond George Good, Jr., architects in the construction of the Grandview Elementary School; that this alleged sum was obtained by wrongful use of fear and under color of official right by the defendant between July, 1973, and continuing to May, 1977, while the defendant was a member of the Derry Area School Board in Westmoreland County, Pennsylvania.

The second count of the indictment charges that the defendant again unlawfully and willfully obstructed, delayed and affected interstate commerce by extortion, in that he attempted to and obtained an alleged sum of Five Thousand ($5,000.00) Dollars from Desmone and Szalai Associates, and Charles L. Desmone, Architects for the construction of the Eastern Westmoreland Area Vocational Technical School, that the alleged sum was obtained by the defendant by the wrongful use of fear and under color of official right between March 1974, and continuing until 1976, while the defendant was a member of the school board for the Eastern Westmoreland Area Vocational Technical School and a member of the joint operating committee for this school board.

### A. *Count One*

The evidence of trial showed that in April of 1971, the architectural firm of Williams, Shields, Snyder, and Goas was selected for an elementary school construction project in Derry Township. Over the next two years, the firm did a feasibility study, and prepared schematic drawings for the Grandview Elementary School. During this time, the firm earned roughly fifteen (15%) per cent of its fee, or $60,000.00–$70,000.00, but had been paid very little money (Tr. 97–101).

In July of 1973, Donald G. Williams, a partner in Williams, Shields, Snyder and Goas, met with the defendant, who was then the president of the Derry Township School Board, in a restaurant in Breezewood. The defendant said that "they had to have somewhere in the neighborhood of

$12,000.00 from (the firm) to keep the project going." (Tr. 102) At first Williams refused, but when the defendant persisted, Williams said that he would discuss the matter with his partners (Tr. 106–107). Williams met with his partners, and they agreed to make payments to Lena because they "were well into the project and had a big investment and felt that they could, even though (the firm) had the contract, could figure out some way to fire us." (Tr. 107) Between July of 1973, and April of 1977, the firm made ten or twelve payments totalling approximately $8,000.00 to Lena. The payments usually occurred after the firms had submitted bills to the school district. Lena would call Williams and advise him that he would "have to take care of them if the bill was going to get on the agenda." (Tr. 111)

The evidence showed that Williams, Shields, Snyder and Goas was licensed to do business in Maryland, as well as in Pennsylvania. In the early 1970's the firm had a good deal of business in Maryland and maintained an office there (Tr. 115–116). As part of its responsibilities in connection with the Grandview Elementary School project, the firm supervised construction of the school building, which included materials imported from a number of states other than Pennsylvania (Tr. 120–123).

### B. *Count Two*

The evidence at trial also showed that the Eastern Westmoreland Vocational Technical School, built in 1975, was sponsored by three school districts: Latrobe, Derry Area and Ligonier Valley. The 27–member school board for the Vo–Tech School was comprised of nine members from each of the participating districts. Between 1968 and 1975, the defendant represented Derry Area on the Vo–Tech School Board. He was also on the nine–member joint operating committee from 1972 to 1975, and on the site selection committee beginning in 1971 (Tr. 399–402).

The Vo–Tech School was designed by the architectural firm of Desmone and Szalai (Tr. 402). Charles Desmone testified that his firm was selected for the Vo–Tech School project in June of 1970. Thereafter, the firm spent approximately $30,000.00, in the three and one–half year site selection process. A site for the school was approved by the joint board in March of 1974 (Tr. 311–312).

Late in 1973, or early in 1974, the defendant asked Desmone to meet him for lunch. At the meeting Lena told Desmone that it was customary for the architects in state construction projects to pay a portion of their fees to secure their jobs (Tr. 316). Lena further indicated that he was "in a position to control the members of the Derry Board in exchange for money." (Id.) Desmone said he "would have to think about that," but, after a second conversation with Lena, agreed to pay him $6,000.00, (Tr. 317–318). Desmone agreed to pay the money because he "had spent over $30,-000.00, in the site selection process," and felt that there was no way to retrieve that money, and "if the project didn't go ahead, then there was no way (he) could get the $30,000.00 out." (Tr. 318)

Desmone made five or six payments of between $800.00, and $1,200.00. The first payment was made sometime in 1974, and the last in 1975. The payments were usually made about the times that the architectural firm submitted its invoices for its services. Desmone would place a check in an envelope and put the envelope in the map holder on the passenger side of his automobile. He would then pick up Lena, and they would go to lunch. While travelling to or from the restaurant, Lena would take the envelope (Tr. 318–322).

The evidence showed that Desmone and Szalai purchased supplies from outside Pennsylvania (G. Ex. 7; Tr. 322–323), and that materials used in the construction of the Vo–Tech School were imported from outside Pennsylvania (G. Ex. 1; Tr. 327–328). As part of its responsibilities in connection with the school construction project, the architectural firm supervised construction, and ensured that the materials purchased–including those purchased out of state–met its specifications (Tr. 321–322).

A discussion of the several issues raised by the defendant in this matter is now in order.

*Did this Court err in failing to grant the defendant's motion for acquittal at the close of the government's case, and for a directed verdict at the close of the defendant's case, for the reason that there was lacking sufficient credible evidence to establish the requisites of the government's case to prove the defendant's guilt "beyond a reasonable doubt"?*

■ It is the opinion of this Court that there was sufficient evidence produced by the government to submit both counts of this case to the jury, and it is further the opinion of this Court that the evidence presented to the jury was sufficient to sustain the defendant's conviction.

■ In his first argument, the defendant makes a lengthy attack on the credibility of the government's witnesses. At best, however, he raises the same factual issues that were submitted to the jury and were decided against him. The Court's function is not to "weigh evidence" or to "judge the credibility of witnesses." *United States v. Greenlee*, 517 F.2d 899, 902–903 (3d Cir. 1975), *cert. denied*, 423 U.S. 985, 96 S.Ct. 391, 46 L.Ed.2d 301 (1975). At this point in the proceedings the question is not whether the Court agrees with the jury, but rather it is whether viewed in the light most favorable to the government, the evidence supports the guilty verdicts. E. g., *United States v. Kenny*, 462 F.2d 1205, 1226–1227 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). We respectfully submit that the evidence–particularly the clear and unequivocal testimony of Donald Williams and Charles Desmone–provides substantial support for the finding that the defendant extorted money in connection with two school construction projects.

■ Thus, the defendant's specific attacks on the credibility of Williams and Desmone are beside the point. The defendant was entitled to test their credibility in cross–examination and to attack it in closing argument. When the jury chose to believe the two men, however, it was acting within its proper role as factfinder. Even the uncorroborated testimony of an accomplice may form the evidentiary basis for a conviction. See *Cool v. United States*, 409 U.S. 100, 103 n.4, 93 S.Ct. 354, 356, n.4, 34 L.Ed.2d 335 (1972); *United States v. Armocida*, 515 F.2d 29, 48 (3d Cir. 1975), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). There is no basis upon which its determination can properly be disturbed.

In any event, Williams and Desmone were credible witnesses. Each testified very definitely that the defendant had expressly asked them for money and had indicated that, if payments were not made, their respective school contracts would be in jeopardy. Although when first approached by agents of the Federal Bureau of Investigation, each man had denied making payments, there was no evidence that either man had ever lied under oath.

■ The defendant contends that the evidence failed to show that the defendant was in fact in a position to influence the Derry Area or Vo–Tech School Boards. No such showing was necessary, however. As the Third Circuit held in *United States v. Mazzei*, 521 F.2d 639, 643–644 (3d Cir. 1975), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), in order to show that in making a threat, a public official acted under color of his official right, it is not necessary to establish his actual power to carry out his threat. A wrongful use of his office is made out when he exploits a reasonable belief on the part of his victim that the power to carry out the threat exists. *Id.* As the Eighth Circuit has put it: "There is no requirement . . . that the official have the actual power needed to perform an act which is the basis of the extortionate scheme." *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976). See *United States v. Harding*, 563 F.2d 299 (6th Cir. 1977).

■ The reasonableness of a victim's belief that a threat of harm is real is of course a jury question. *United States v. Mazzei, supra.* In this case, the evidence showed

that Williams and Desmone entertained a reasonable fear that the defendant could cause the loss of their respective school construction projects.

*Was there sufficient and proper evidence presented to the jury to warrant the jury in finding that the acts of the defendant were extortionate and that said extortion did in some "way or degree obstruct, delay or affect commerce?"*

██ It is the opinion of this Court that the evidence presented to the jury was both proper and sufficient to warrant the jury in finding that the acts of the defendant were extortionate and that said extortion did in some way or degree obstruct, delay or affect interstate commerce.

 The Hobbs Act, Title 18, United States Code, Section 1951, proscribes among other things, any extortion that "in any way or degree obstructs, delays, or affects commerce . . . ." This broad language manifests "a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). There is no requirement that an act of extortion be done for the purpose of affecting interstate commerce. *United States v. Varlack*, 225 F.2d 665 (2d Cir. 1955). The statute is violated if the act has as one of its natural affects the impediment or obstruction of such commerce. *United States v. Addonizio*, 451 F.2d 49, 77 (3d Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Accordingly, it is well settled that the depletion of the resources of a business engaged in interstate commerce is, by itself, an affect on commerce within the meaning of the statute. *United States v. Addonizio*, supra; *United States v. Provenzano*, 334 F.2d 678, 692–693 (3d Cir. 1964); *United States v. Phillips*, 577 F.2d 495, 501 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978); · *United States v. Merolla*, 523 F.2d 51, 54 (2d Cir. 1975). The drain on resources has an inevitable effect on the capacity of the business to conduct its own affairs and therefore gives rise to the inference that interstate commerce is affected. *United States v. Mazzei, supra.*

██ In this case, the evidence showed that Williams, Shields, Snyder and Goas did business in Maryland and Pennsylvania. Its capacity to do business in Maryland, like its capacity to do business generally, was inevitably affected by its payment of money to meet the extortionate demands of public officials. Desmone and Szalai purchased supplies from out of state. The payments it was forced to make reduced its purchasing power and thereby affected the interstate market for the products it purchased.

Moreover, both architectural firms supervised construction projects for which materials were imported from out of state. The fact that the architects themselves did not directly make the purchase is immaterial. In addition to designing the buildings, the architects supervised construction and ensured that the materials met their specifications. They were obviously essential to the construction process. Since construction could not possibly occur without architects, any depletion in the assets of architects necessarily affects building construction and the interstate market for construction materials. This effect on interstate commerce is sufficient to trigger federal jurisdiction under the Hobbs Act. See *United States v. Staszcuk*, 517 F.2d 53 (7th Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

*Did this Court err in permitting the introduction of evidence of criminal acts occurring before December 5, 1974, and did it err in failing to rule that the Statute of Limitations barred one or both counts of this indictment against the defendant?*

It is the opinion of this Court that it was not error to permit the introduction of evidence criminal acts occurring before December 5, 1974, and further, it is the opinion of this Court that the Statute of Limitations did not bar either Count One or Count Two of the indictment against the defendant.

Having been indicted on December 5, 1979, appellant could properly be prosecuted only for payments made after December 5, 1974. The evidence at trial clearly established that appellant received extortionate payments within the period of limitations. With respect to Count One, Donald Williams testified specifically that he had made his final payment to appellant in April of 1977 (Tr. 111). Moreover, it is reasonable to infer from Williams' testimony that he made ten or twelve payments between September of 1973, and April of 1977, and that several of the payments were made in the years 1975, and 1976. With respect to Count Two, Charles Desmone testified specifically that a payment had been made in the summer of 1975 (Tr. 365).

The fact that the defendant was no longer a school board member when he received the final payment from Williams is immaterial. One who is not himself a public official may extort money under color of official right if he purports to exercise influence over those who are public officials. See *United States v. Sander*, 615 F.2d 215 (5th Cir. 1980). It follows that one who, as a public official, has been receiving extortionate payments continues to commit an offense if he receives as part of the same series of payments, additional payments, after he leaves office.

In this case, the defendant and Williams agreed on a total figure long before the defendant left office. Williams obviously made the final installment after Lena left office as "consideration" for Lena's earlier forbearance from inflicting a serious financial loss on the architectural firm. Williams also may well have feared that, although no longer a board member, appellant continued to exercise at least some influence over the school board. As indicated above, the reasonableness of any such concern about appellant's continuing influence was a jury question. See *United States v. Mazzei, supra.*

Appellant's contention that evidence of payments made prior to December 5, 1974, should have been excluded is without merit. Where, as in this case, extor-

tionate payments are part of a "single and unified" scheme, it is entirely proper for the government to prosecute the transaction as a single offense and to prove the entire offense, including acts done outside the period of limitations, provided of course that the offense continued, as did the defendant's into that period. *United States v. Provenzano*, 334 F.2d 678, 684–685 (3d Cir. 1964), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964); *United States v. Cohen*, 444 F.Supp. 1314 (E.D.Pa.1978).

Analogously, it has been held that, since the mailing is the offense in a mail fraud prosecution, if the mailing occurs within the period of limitations, the prosecution is not barred by the fact that it was done in furtherance of a scheme to defraud that originated beyond the period of limitations. *United States v. Gross*, 416 F.2d 1205, 1210 (8th Cir. 1969), *cert. denied*, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970); *United States v. Garland*, 337 F.Supp. 1 (N.D.Ill.1971). Similarly, a conspiracy that began outside the period of limitations may be prosecuted if it continues to a time within the period, and an overt act is committed within that time. *Grunewald v. United States*, 353 U.S. 391, 396–397, 77 S.Ct. 963, 969–970, 1 L.Ed.2d 931 (1957); *United States v. Brasco*, 516 F.2d 816, 818 (2d Cir.), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). And, if an overt act is shown to have occurred within the period of limitations, evidence of acts committed outside the period may properly be considered by the jury as proof of the conspiracy. *United States v. Romano*, 516 F.2d 768 (2d Cir.), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975). Likewise, an extortionate payment may properly be prosecuted under the Hobbs Act if it was made within the period of limitations. If it was done pursuant to a scheme that originated outside the period of limitations, the entire scheme may be proved.

*Was there prosecutorial misconduct in this case warranting a new trial involving the following:*

*1. Testimony concerning convictions of other persons on similar charges.*

2. *Comments by the prosecuting attorney in his opening statement to the jury that he would offer evidence of purchases of construction materials outside of Pennsylvania to show the effects of the defendant's criminal activities on interstate commerce.*

3. *Comments by the prosecuting attorney in his closing argument characterizing the defense attorney's arguments as "spurious".*

4. *Comments by the prosecuting attorney in his closing argument characterizing the defendant's conduct as "an abuse of public office".*

5. *Comments by the prosecuting attorney in his closing argument by stating, "He's on trial and a verdict of guilty means some type of criminal sanction. Even if it would be a suspended sentence, it says that you did something wrong and violated the law."*

This Court is of the opinion that there was no prosecutorial misconduct in this case that would warrant the granting of a new trial.

The defendant makes five claims of prosecutorial misconduct at trial. For the reasons that follow, each of these claims is without merit.

1. In cross–examining architect Williams, defense counsel brought out that the witness had made other payments to officials in Wilkes Barre, York and Shamokin (Tr. 144). Counsel then characterized these payments as "bribes" (*id.*). Shortly thereafter, counsel asked Williams whether bribery of public officials was "part of (Williams') firm's way of doing business ..." (Tr. 147). Thus, defense counsel was clearly trying to show that Williams could not have been the victim of any extortion by the defendant because he was quite willing to make payments to officials as part of his business.

In his re–direct examination, the Assistant United States Attorney asked whether the officials in Shamokin had been prosecuted, and then he asked whether they had been convicted (Tr. 237). After the latter

question, defense counsel moved for a mistrial. The Court denied the motion, but instructed the jury that convictions in another case have nothing to do with this case, and should have no bearing on the jury's deliberations in this case (Tr. 237–238).

■ In arguing that the Assistant United States Attorney acted improperly, the defendant relies on decisions holding that in some circumstances, the admission of evidence of a conviction or guilty plea of a co–defendant or a co–conspirator may be prejudicial. See e. g., *United States v. Fleetwood*, 528 F.2d 528 (5th Cir. 1976); *United States v. Harrell*, 436 F.2d 606 (5th Cir. 1970). See generally Annotation, 48 A.L.R.2d 1016. Appellant's reliance on such cases is misplaced for two reasons. First, it was clear in this case that the convictions involved persons who had not dealt with Lena. It may safely be assumed that the jurors realized that convictions of other public officials in other parts of Pennsylvania had no direct bearing on the defendant's culpability. Any question in this regard was put to rest by the Court's prompt and complete instructions to the jury. Second, defense counsel opened the door by his earlier inquiry into the making of other payments by Williams. Once defense counsel had raised the possibility that Williams may have acted freely and voluntarily in this case, it was important that the government show that any other payments by Williams were made, not because he routinely made such payments, but rather because he had been subjected to extortion. Having brought out the Shamokin payments, among others, defense counsel should not have been heard to complain of the government's effort to explore all the circumstances of those payments, including the propriety of the conduct of the officials involved. See *United States v. Cook*, 461 F.2d 906, 910–911 (5th Cir. 1972).

■ 2. The defendant argues that the prosecuting attorney should not have referred in his opening statement to evidence that construction materials for the two school projects involved in this case were

purchased out of state. As was stated above in this Opinion, evidence of the purchasing of such materials was a proper means of establishing the interstate commerce element of Section 1951. The evidence was relevant and properly admitted. It was, therefore, a proper subject for comment in the government's opening statement.

 3. The defendant asserts that, in his closing argument, the Assistant United States Attorney characterized defense arguments as spurious. An examination of the transcript of the arguments, however, fails to reveal the use of the word "spurious" or any other derogatory adjective. While a prosecuting attorney should not ridicule his opponent, *Carter v. United States*, 437 F.2d 692 (D.C.Cir.1970), there was no ridicule here. Counsel for the government merely suggested reasons why anticipated defense arguments were without merit, and in so doing, was merely fulfilling his responsibilities as an advocate for the government in connection with closing argument.

While a prosecuting attorney may not strike "foul" blows, he may and indeed should strike "hard" ones. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The blows struck in this case may have been hard, but they were in no sense foul.

4. The defendant argues that he was prejudiced by a reference, in the government's closing, to his conduct as an abuse of public office. This characterization of the defendant's conduct was entirely proper because it was supported by the evidence. E. g., *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978) (description of defendant as "con man" and "hoodlum" proper where supported by the evidence).

It has been held in mail fraud cases that, where the victim of a scheme to defraud is an insurance company, the prosecuting attorney may point out to the jury that the ultimate victims are insurance customers. *United States v. Medansky*, 486 F.2d 807, 815 (7th Cir. 1773), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 886 (1974). It

is likewise proper in an extortion prosecution under Section 1951 for the prosecuting attorney to state that, when a public official abuses his office, the ultimate victim is the public.

 In this case, the prosecuting attorney did not suggest that the jurors themselves were victims or that any of them would suffer from the defendant's conduct. His characterization of the nature and effect of the defendant's conduct was entirely proper.

 5. In addressing the factors bearing on the credibility of the witnesses, including the defendant, the Assistant United States Attorney pointed out that the defendant had a strong interest in the outcome of the trial. Government counsel stated in reference to the defendant: "He's on trial and a verdict of guilty means some type of criminal sanction. Even if it would be a suspended sentence, it says that you did something wrong and violated the law." (Tr. closing argument 10). Subsequently, the Court instructed the jury it should not consider the penalty that would be imposed if the defendant were convicted (Tr. 452).

The defendant contends that the reference to a suspended sentence constituted grounds for a mistrial. The reference, however, was made in the context of an entirely proper comment on the defendant's interest in the outcome of the trial. There was no suggestion that the defendant would receive a suspended sentence or that, for that reason, the jury should give the case less than the most serious consideration. In any event, the court's instruction removed any possibility that the jury would take possible penalties into account in its deliberation.

*Did this Court err in admitting testimony of Roy Bergman concerning evidence of other similar criminal misconduct of the defendant.*

 It is the opinion of this Court that the admission of the testimony of Roy Bergman was proper and was not legally remote or prejudicial.

At trial, Roy Bergman testified that his conduct to supply milk to the Derry Area School District had been reduced after he had refused to make payments to the defendant. The defendant contends that Bergman's testimony should not have been admitted largely because school district records showed that the cut in Bergman's contract occurred in the 1970–1971 school year, and not in 1973 as he had testified. (See Tr. 2/7/80, 146–147).

Bergman's testimony was properly admitted. Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As the Third Circuit observed in *United States v. Long*, 574 F.2d 761, 765–766 (3d Cir. 1978), Rule 404(b) is a rule of inclusion, not exclusion. That is to say, evidence of other crimes is admissible "unless it could be said that it was being offered solely to show that a defendant had criminal propensities." *Id.*, 574 F.2d at 766.

Bergman's testimony tended to show that the defendant had the power to carry out his extortionate threats. The existence of that power in turn tended to increase the likelihood that the threats had been made. One with the power to carry out a threat is more likely to make the threat than is one who has no such power. Thus, Bergman's testimony tended to show that Lena had in fact made threats against Williams and Desmone.

The fact that Bergman may have been mistaken as to exactly when Lena made and carried out his threat is neither surprising, given the passing of several years, nor grounds for excluding Bergman's testimony. The fact that a witness may not have a perfect recall about an event is no reason to exclude his testimony. Defects in his recollection are of course proper subjects for cross–examination and impeachment, but such defects do not render his testimony inadmissible. *United States v. Snead*, 447 F.Supp. 1321, 1324 (E.D.Pa.1978), affirmed, 577 F.2d 730 (3d Cir.), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2829, 56 L.Ed.2d 775 (1978). The defendant was given a full and fair opportunity to attempt to show that Bergman was unreliable. He was entitled to no more.

*Was the rebuttal testimony of C. J. Earl Tarr and William Oleszewski properly admitted in evidence in this case?*

The rebuttal evidence of these two men was properly admitted in this case.

In rebuttal, the government called witnesses, C. J. Tarr and William Oleszewski. Tarr, a long–time member of the Derry School Board, and Oleszewski, guidance counselor and former football coach at Derry High School, each testified that appellant exercised some control over other school board members and that he had a poor reputation for honesty (Tr. 486–489, 498, 500–502). This testimony was entirely proper rebuttal in that it contradicted two principle elements of Lena's defense; testimony that he exercised no control over the school board, and a long line of witnesses who attested to his good character. See F.R.Evid. 404(a)(1).

The defendant's statement that Oleszewski could not testify on the question of school board control because he had attended only school board meetings occurring before Lena was on the board is untrue. Oleszewski testified that he had attended school board meetings for the first year or two that Lena was present (Tr. 502). The defendant's suggesting that Oleszewski may have had a personal motive for testifying against Lena, i. e., his having been relieved of his coaching position, is a matter going only to Oleszewski's credibility. It had nothing to do with the admissibility of his testimony.

*Did this Court err in refusing to strike Jurors who had served as Jurors in another case tried by the same prosecutor; Did this Court err in allowing the Jury to continue*

*to deliberate after it indicated that it might be deadlocked?*

The defendant makes two claims of error that concern the jury and its deliberations. First, he contends that certain prospective jurors should have been struck for cause because they had served on a jury in another public corruption case prosecuted by Mr. Lindsay, one of the two prosecuting attorneys in this case. In the earlier trial, three of four defendants were convicted; one defendant was acquitted on the ground that his prosecution was barred by the statute of limitations.

 Prospective jurors are not automatically disqualified by virtue of their service on a jury in a similar case or their familiarity with the prosecuting attorney. *United States v. Drake*, 494 F.2d 648 (5th Cir. 1963); *United States v. Daniels*, 64 F.R.D. 397 (E.D.Pa.1974). The trial judge should of course question prospective jurors as to whether their prior service or their familiarity with the attorney would affect their ability to render a fair and impartial verdict. *Lane v. United States, supra.* The court did exactly that in this case, and excused one juror who may not have been able to be impartial (Tr. 14–30). The court's decision to accept the representations of the other jurors that they could be impartial was entirely proper.

Second, the defendant contends that the court erred in sending the jury back to deliberate after it had asked whether it could render a verdict as to only one of the two counts. He argues that the action of the court amounted to a coercive "Allen" charge. See *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). But, the traditional "Allen" charge emphasizes the jury's duty to reach a verdict if it can, and each juror's responsibility to give careful consideration to the views of his colleagues, even to the extent of re–examining his own attitudes and opinions. In certain circumstances, particularly where it appears that there are one or two "hold–outs" among the jurors, such a charge may be coercive. See *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

In this case, there was no "Allen" charge. The court did not instruct the jurors to reconsider their own opinions in light of the views expressed by their colleagues, but merely said that the jury "should continue your deliberation making some reasonable effort to reach a unanimous verdict." (Tr. 517). The court emphasized that, by sending the jury back for further deliberations, it was not suggesting that any juror should change his mind (*id.*).

 Where, as in this case, a court responds to the first sign of a deadlock merely by suggesting continued deliberation and does not "refer to the expense of a second trial or the need for the minority to reconsider its votes, [impose] (any) coercive deadline, (make) ... threats of marathon deliberations, (or) [exert] ( ) ... pressure for the surrendering of conscientiously held minority views," there has been no coercion of the jury. *United States v. Warren*, 594 F.2d 1046, 1050 (5th Cir. 1979), quoting *United States v. Solomon*, 565 F.2d 364, 366 (5th Cir. 1978).

 As the Third Circuit said in *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 935–936 (3d Cir. 1974): "How long jury deliberations should continue is a matter entrusted to the discretion of the trial judge. ... Absent peculiar evidence indicative of coercion, it is proper for a judge to instruct a deadlocked jury to continue deliberations and attempt to arrive at a verdict." See *United States v. Grosso*, 358 F.2d 154, 159 (3d Cir. 1966), reversed on other grounds, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). In this case, the jury did not indicate that it was hopelessly deadlocked, it merely alluded to the possibility that a deadlock may occur. The Court, which had no reason to believe that further deliberations would be fruitless, committed no abuse of discretion in indicating that the jury should continue its deliberations.

*Did this Court err in denying a number of the Defendant's Points for Charge?*

 It is the opinion of this Court that it properly denied a number of the Defend-

ant's requested points for charge, and it is the further opinion of this Court that it properly granted the government's requests for instructions to the jury.

The defendant argues that the Court erred in refusing to give eight of his requested instructions. Six of these instructions, Nos. 2, 3, 4, 5, 6 and 7, concern Pennsylvania law with respect to political contributions by corporations and the Standards of Ethical Practice for architects. In cross–examining the principal government witnesses in this case, architects Williams and Desmone, the defendant fully explored the impropriety of their conduct in this and other cases. The jury was thus well aware that the witnesses had acted contrary to the law and to the ethical standards of their own profession.

There was no reason for the Court to give lengthy and confusing instructions on Pennsylvania law or ethical standards. The architects were not on trial. Detailed instructions on laws or standards not applicable to the charges against the defendant would have injected a potentially distracting and confusing collateral issue into the jury's deliberations.

The defendant was given ample opportunity to impeach the credibility of Williams and Desmone and to argue their credibility to the jury. That is all he was entitled to do. The Court properly refused to allow the defendant to transform the trial into a state law prosecution or a professional disciplinary proceeding against government witnesses.

The remaining two instructions, 14A and 16, were a detailed listing of factors that, under the defendant's view of the case, had a bearing on the credibility of Williams and Desmone. A trial judge should not, however, give a closing argument for the defense submitted in the form of a request for instructions. *United States v. Heath*, 580 F.2d 1011, 1025 (10th Cir. 1978).

In this case, the Court gave a complete instruction on general considerations bearing on witness credibility (Tr. 462–465).