**UNITED STATES of America,
Plaintiff/Appellee,**

v.

**Danny Bill SANDER, a/k/a Danny
Sander, Defendant/Appellant.**

**No. 79–5236.**

United States Court of Appeals,
Fifth Circuit.

April 7, 1980.

Rehearing and Rehearing En Banc
Denied May 9, 1980.

Richard D. Esper, El Paso, Tex., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before TUTTLE, AINSWORTH and SAM D. JOHNSON, Circuit Judges.

PER CURIAM:

Appellant Danny Bill Sander, a/k/a Danny Sander was convicted of violation of 18 U.S.C. § 1951 (Hobbs Act) by a jury. The indictment charged him with obstruction of Interstate Commerce by extortion.

Appellant Sander complains in this appeal of the sufficiency of the evidence to show the two essential elements of the statute under which he was convicted. First, he claims that the evidence was insufficient to show that what he did had an effect on Interstate Commerce and secondly, that the proof failed to show that he put the alleged victim of the extortion, one Knapp, in fear, either actual or economic. He also complains of the District Court's failure to grant a dismissal of the indictment because of breach of his right to counsel. All of his contentions are without merit and we affirm his conviction.

In order to dispose of his insufficiency of the evidence claims, it is necessary to outline the evidence presented at his trial.

D & B Development, a partnership owned by Richard Arthur Knapp of El Paso, Texas, and his brother Robert Knapp of Englewood, Colorado, acquired a six mile square tract of land on North Franklin Mountain in El Paso County, Texas, for various areas of development. The tract that was to be developed is known as the Tin Mine. Sometime in June of 1978, D & B Development started earth moving operations on this six mile tract of land. In addition to earth moving, D & B built roads and dams and developed subdivisions. D & B intended to construct six communication towers on top of Franklin Mountain, develop land quarries and a landfill, mine for tin, and also intended to build stables and a resort lake. Eventually, they intended to put in 1200 acres of residential area.

In the process of developing this six mile tract of land, D & B Development purchased some $400,000 worth of tractors and equipment from Rust Tractor Company of Albuquerque, New Mexico. Exploration services on the tract were provided by California Exploration Corporation of Laguna Beach, California. A water well on the project was drilled by Agua Drilling Company of Anthony, New Mexico. D & B

Development also used a consulting engineer from Boulder, Colorado. Cooper Aerial Survey Company of Tucson, Arizona, made the aerial topography maps for the project. The partnership also used the services of a California attorney on condemnation problems.

When the development started, the land could be used for all the projects contemplated by D & B Development. However, in October of 1978, the land was annexed by the City of El Paso and the six mile tract of land was rezoned for residential purposes only. The rezoning made it virtually impossible for D & B Development to continue its operations and to do what they had intended to do with the land and on which operations they had already spent large sums of money, some "two or three million dollars."

At the time of the annexation D & B Development requested the City Planning Commission to zone the land so as to permit them to continue their operations. The City Planning Commission, however, denied the request and zoned the land for residential purposes only. The only alternative remaining to D & B Development was to apply to the Zoning Board of Adjustment for a two year temporary use permit. The temporary use permit would permit D & B Development to continue their on-going operations despite the restrictive residential zoning given to the tract by the City Planning Commission. Their request for the temporary use permit was to be considered by the Zoning Board of Adjustment on December 11, 1978.

Some ten days before the Zoning Board was to consider the temporary use application, Appellant Sander contacted Richard Arthur Knapp and talked to him about the difficulties that they were encountering with their zoning problem. He offered to contact people on the Zoning Board to take care of the problem if Knapp were interested. Knapp, however, told Sander that he would consider his offer. A few days later, Appellant Sander again called Knapp to see what Knapp had decided. Up to that time Knapp had not taken Appellant's offer seriously. However, the day before the hearing on the temporary use permit, Knapp began seriously considering Appellant's offers of assistance. He wanted to get through to the people that he considered had been "giving him the heat." Richard Arthur Knapp felt that he would not be given fair treatment by the Zoning Board of Adjustment should he not submit to Sander's plan, something that would result in severe financial harm to him. He decided to discuss Sander's offer with his attorney, and agreed with him to contact the legal authorities. Knapp and his attorney met with the authorities and it was agreed that he would place recorded telephone conversations to Appellant Sander. These recorded telephone conversations were later played to the jury during the trial. During one of these telephone conversations, it was agreed that Sander would contact his source and learn how much was required to insure that the permit sought by D & B Development would be granted by the Zoning Board of Adjustment. Appellant Sander told Knapp that the price would be $10,000 and that this would ensure that D & B Development would receive two or three favorable votes from the Zoning Board of Adjustment. Sander informed Knapp that $4,000 would go to someone "higher up," $2,000 would go to each of two additional members, and he, himself, would earn $2,000 which he said he would return to Knapp. In the last recorded telephone conversation, Knapp and Sander confirmed their agreement and Knapp told him to go ahead and that he would supply the $10,000. It is not clear whether or not Appellant Sander was present when the temporary use permit was being discussed, but Knapp did see him at the City Hall the day of the hearing. The vote on the application for the temporary use permit was favorable and D & B Development received the permit to continue operating. Knapp had agreed to pay Sander the money after the favorable vote was entered and he spoke to Sander on the telephone and in person about it. The conversations between Knapp and Sander after the favorable vote were again recorded. During these conversations Appellant Sander informed Knapp

that he "may get some grief down the line," if he did not pay the money and that the Zoning Board "could back this thing up through channels" and cause "all kinds of waives and problems."

It was finally agreed that Knapp would leave the $10,000 in a brown envelope at his office for Sander to collect. Knapp obtained the money, $10,000 in $100 bills, from the El Paso Police Department. Sander did come to the office of Knapp and left his office carrying the brown envelope. As Appellant Sander was leaving Knapp's office carrying the brown envelope, he was arrested and he was found in possession of the $10,000 in marked bills. After Sander was advised of his rights, he told the officers that he was only the middle man, he could deliver one or two members of the Zoning Board on a "silver platter," and that he was in the scheme for compensation.

■ On appeal, Appellant Sander's challenges to the sufficiency of the evidence to establish the effect of his actions on interstate commerce and the fear of the victim of the extortion scheme must be viewed in the light most favorable to the verdict with all reasonable inferences and credibility choices made to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Since no motion for acquittal was made at the end of the government's evidence, this Court's review of the evidence is limited to a determination of whether there has been a manifest miscarriage of justice. *United States v. Bourg*, 598 F.2d 445, 448 (5th Cir. 1979). The evidence in this case fails to show a manifest miscarriage of justice.

■ The Hobbs Act, 18 U.S.C. § 1951 is a broadly drawn statute. The cases construing the Act have repeatedly emphasized that the Congress in passing the ·statute wanted to use all of the constitutional power it had to punish interference with interstate commerce by extortion, robbery or physical violence. The plain terms of the statute outlaw interference with interstate commerce "in any way or degree." *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). This Court had an opportunity recently to review the Hobbs

Act in *United States v. Summers*, 598 F.2d 450 (5th Cir. 1979). In that case, this Court held that all that is necessary is that the impact of the extortion affect interstate commerce to a minimal degree and that doing business with out of state companies and the purchase of goods out of state have been held sufficient to establish an interstate nexus so as to provide the victim with the protection of the Hobbs Act. The evidence in this case was ample to show that D & B Development was doing business with out of state companies and purchasing goods from them before and during the time period of the extortion. At the time of the extortion, D & B Development Corporation was an on-going business, and it is realistic to assume that D & B Development Corporation would continue to conduct business on an interstate basis. Consequently, there was sufficient evidence that Sander's extortionate conduct had had some effect on interstate commerce and was likely to have the natural effect of obstructing interstate commerce in the future, *U. S. v. Carpenter*, 611 F.2d 113 (5th Cir. 1980); *U. S. v. Summers*, supra, 598 F.2d at 454–455. The Court below properly charged the jury that if they believed the evidence with regard to the dealings of D & B Development with firms outside of Texas that then they could find that Sander's actions had an effect on interstate commerce. This apparently the jury found by their verdict.

■ Appellant Sander argues that he never threatened Knapp, and consequently that the element of fear, a required element of the Hobbs Act, was not present. Fear of economic loss is covered by the Hobbs Act. The case law is also clear that the government did not have to show either that the fear was a direct consequence of the threat of economic loss or that Knapp personally feared Sander. *United States v. Quinn*, 514 F.2d 1250, 1266–67 (5th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). Subtle extortions are covered under the Hobbs Act, and the government satisfied its burden of proof if it showed circumstances surrounding the alleged extortionate conduct that rendered the victim's fear of threatened loss reasonable.

The evidence at trial showed that Sander did threaten Knapp with economic loss if he failed to supply the promised bribe money. Sander telephoned Knapp subsequent to the favorable vote on the application for the temporary use permit. During these conversations, he informed Knapp that failure to pay might result in "some grief down the line," and that the Zoning Board "could back this thing up through channels" and cause "all kinds of waives and problems." At that point, if not when Sander first approached Knapp with his offer to bribe the El Paso Zoning Board, Knapp realized that any unfair treatment from the Zoning Board would stem from failure to comply with Sander's request for the payment of the bribe money. Prior to Sander's demand for payment, Knapp may have feared economic loss from a decision by the Zoning Board not to approve the application for a temporary use permit. At that point, however, Knapp's fear of economic loss focused upon Sander's demand for payment, and his belief that payment of the money would prevent the feared economic injury is reasonable in light of the surrounding circumstances. The facts also show that Knapp faced a potential loss of millions of dollars, and Sander's threat of economic loss, at least indirectly, if not directly, induced Knapp to part with the money to prevent such threatened economic loss.

Sander's final allegation is that his Sixth Amendment right to counsel was violated when detectives of the El Paso Police Department examined his file at his attorney's office. He argues that his motion to dismiss the indictment should have been granted. A hearing on this motion was held by the Court below outside of the presence of the jury. The evidence presented on the motion showed that Appellant Sander had retained the services of an attorney by the name of Lee Chagra to represent him on the extortion charge. Some ten days later, attorney Chagra was murdered in his office. The El Paso police assumed custodial possession of Chagra's office for the next five days. Detective Lattimer of the El Paso Police Department testified that while interviewing Chagra's secretaries, Sander's name came up as a possible suspect. His file was procured. Lattimer glanced through it looking for addresses and any connection to the murder. Even though Sander testified that he had given Chagra a handwritten statement, Lattimer testified that he had seen no such handwritten document and a typewritten statement that was in the file was left there, and Sander received that typewritten document before his trial below. Lattimer also testified that he did not discuss anything he saw in the file with any federal agents and that no evidence was supplied to the government by Lattimer. Nothing that was in his attorney's file was ever used by the government in this case.

Where there is an intrusion on the attorney-client relationship the remedy for such a violation is not dismissal but the suppression of any evidence so obtained. *United States v. Kilrain*, 566 F.2d 979, 982 (5th Cir. 1978), *cert. denied*, 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109. *United States v. Franklin*, 598 F.2d 954, 957 (5th Cir. 1979). Appellant Sander made no showing of injury or prejudice because of the fact that his file at his attorney's office was viewed by the El Paso police and the Court below properly denied his motion to dismiss.

AFFIRMED.