UNITED STATES of America, Plaintiff,

v.

Michael FREEDMAN and Randall Scott Moore, Defendants.

No. 82 CR 840.

United States District Court,
N.D. Illinois, E.D.

May 12, 1983.

Dan K. Webb, U.S. Atty., Vincent J. Connelly, Julian Solotorovsky, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Gerald Werksman, Chicago, Ill., Frank Oliver, Northfield, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Michael Freedman ("Freedman") and Randall Scott Moore ("Moore") are charged with (1) conspiracy to commit extortion, extortion and attempted extortion, in violation of 18 U.S.C. § 1951 (the "Hobbs Act" or "Section 1951") and (2) mail fraud, in violation of 18 U.S.C. § 1341 ("Section

1341").[1] Freedman and Moore[2] have moved to dismiss the Hobbs Act charges (Counts I to IV) on grounds of legal insufficiency. For the reasons stated in this memorandum opinion and order that motion[3] is granted.

*Background Facts and Counts I to IV*[4]

At the time material to the Indictment Freedman and Moore were attorneys licensed to practice in the State of Illinois. Sean O'Toolis ("O'Toolis") was a defendant in pending Illinois criminal prosecutions.[5] O'Toolis was also involved in making electronic television-signal receiving devices, an enterprise in which he used supplies that had originated outside Illinois and moved in interstate and foreign commerce.

O'Toolis retained Freedman and Moore to represent him in the Illinois criminal actions. Freedman and Moore conspired to obtain about $3,000 from O'Toolis by telling him they would use part of the money to bribe the state judge presiding at his trial and thereby prevent O'Toolis' conviction. Freedman and Moore obtained three payments ($1,500, $300 and $500) from O'Toolis on different dates, each time representing to him the money would be used or was needed to bribe the judge. Unknown to Freedman and Moore, O'Toolis had decided to cooperate with state authorities, and the money paid Freedman and Moore was actually provided by the office of the Cook County State's Attorney. No approach to the state court judge was actually made, and the judge was not involved in the conspiracy.

Count I charges Freedman and Moore "did conspire to commit extortion ... which extortion would affect commerce" in that they conspired to obtain $3,000 from O'Toolis "with his consent, said consent having been induced under color of official right." Counts II to IV differ from each other only by charging the three different payments. Each Count states Freedman and Moore "did commit and attempt to commit extortion ... which extortion would affect commerce" in that they obtained the indicated amount from O'Toolis "with his consent, said consent having been induced under color of official right."

At various points in the parties' briefing of the motion to dismiss Counts I to IV, they have posed the following issues:

1. whether the facts the United States intends to prove would show the nexus to interstate commerce required for Hobbs Act jurisdiction;

---

1. Freedman and Moore were originally charged in an indictment filed November 23, 1982. After motions similar to the current ones were filed and commented on by this Court, a superseding indictment was filed January 18, 1983 and then a second superseding indictment (the "Indictment") was filed January 28 (all subsequent dates without year designations were also in 1983).

2. Freedman originally filed the motion, and Moore later joined in it.

3. At one point or another Freedman and Moore have *also* moved:
   1. to dismiss Count I (the Hobbs Act conspiracy count) as duplicitous;
   2. to dismiss the mail fraud charges (Counts V and VI);
   3. to dismiss the entire Indictment on grounds of prosecutorial vindictiveness and misconduct before the grand jury; and
   4. to sever Hobbs Act Counts I–IV from Section 1341 Counts V and VI.

   Their first-listed motion was apparently mooted by the superseding indictments; and in any event it and the severance motion (the last-listed one) are mooted by this opinion. Defendants' remaining dismissal motions (items 2 and 3) have not been fully briefed and are therefore continued pending the parties' reassessment of their positions in light of this opinion.

4. For current purposes the allegations of the Indictment are taken as true. *Cf. Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 332 n. 16, 96 L.Ed. 367 (1952) (stating that "familiar rule" on review of district court's grant of dismissal motion). In addition the parties have agreed to a fleshed-out statement of background facts (*see* Motion To Sever 2–3 & n. 1). *Cf. United States v. Barta,* 635 F.2d 999, 1002 (2d Cir.1980) (indictment amplified by government's documentary submissions), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

5. O'Toolis was charged with state offenses (*see* Motion To Sever 2) unrelated to his conduct of the business next described in the text.

2. whether those facts would support the charge in Counts II to IV that Freedman and Moore *committed* as well as *attempted* to commit extortion;[6]

3. whether Freedman and Moore can be charged with having acted "under color of official right"; and

4. whether the conspiracy charge of Count I can stand independently of the substantive offense charges of Counts II to IV.

Those issues[7] will be discussed in turn, although the third is dispositive.

### Effect on Interstate Commerce

Section 1951(a) provides:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Section 1951(b)(3) then defines "commerce" broadly to include all interstate (and foreign) commerce:

The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

By its very terms the Hobbs Act thus protects commerce, and it penalizes only inchoate or completed robbery, extortion or violence that obstructs or affects commerce. Although Congress cast the Hobbs Act net widely, *United States v. Culbert,* 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978), a connection to interstate or foreign commerce is a prerequisite to federal criminal jurisdiction under the Act, *United States v. Mattson,* 671 F.2d 1020, 1023 (7th Cir.1982).

Freedman and Moore argue (Dec. 21, 1982 Motion 4–5; Feb. 7 Mem. 2–7) the facts alleged do not show a nexus between their impugned actions and interstate commerce for two independent reasons:

1. There was no connection between O'Toolis' payments and his interstate business.

2. In any event, the money obtained from O'Toolis was provided by the State's Attorney and did not come out of O'Toolis' own funds.

Neither contention has merit.

Our Court of Appeals teaches the requisite effect on interstate commerce under the Hobbs Act may be established by the "depletion of assets" theory. Under that concept "commerce is affected when 'an enterprise, which either is actively engaged in interstate commerce or customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's potential as a purchaser of such goods.'" *United States v. Hedman,* 630 F.2d 1184, 1192 (7th Cir.1980) (quoting *United States v. Elders,* 569 F.2d 1020, 1025 (7th Cir.1978)), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

---

**6.** Discussion of that issue was provoked by this Court's own questions about the government's phrasing of Counts II to IV in the superseding indictments.

**7.** Effect of the extortion on interstate commerce is jurisdictional. *See United States v. Jarrett,* 705 F.2d 198, at 203 (7th Cir. 1983). All the other issues similarly go to the legal sufficiency of the charges. Defendants

and the government (see n. 4) have effectively joined "to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Russell v. United States,* 369 U.S. 749, 768 & n. 15, 82 S.Ct. 1038, 1049 & n. 15, 8 L.Ed.2d 240 (1962), quoting *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1876).

■ Here the Indictment alleges extortion of payments from O'Toolis while he was engaged in an enterprise requiring his use of electronic supplies obtained from sources outside Illinois. True, O'Toolis' enterprise may have been illegal, as Freedman and Moore suggest (Motion To Sever 2).[8] But O'Toolis' business clearly involved him in the interstate market for electronic equipment. *Cf. United States v. Rindone*, 631 F.2d 491, 493 (7th Cir.1980) (extortion victim "was engaged in interstate commerce. His business regularly purchased wire and other electrical equipment from sources outside the State of Illinois."). Whatever else may be said of O'Toolis' business, that involvement establishes the requisite link between his assets and interstate commerce. *Cf. Blakey*, 607 F.2d at 782–84 (extortion victim was involved in narcotics trafficking but also purchased tires in interstate commerce for his tire shop).

Defendants' reliance on *Mattson*, 671 F.2d at 1024–25, is misplaced. There our Court of Appeals reversed a Hobbs Act conviction because there was no connection between an extortion victim and interstate commerce (*id.* at 1025). Though the victim who sought a work-related license was the employee of an interstate enterprise, the extortion payment had been obtained from his personal funds, without reimbursement from his employer (*id.* at 1024). Here, in contrast, the extortion victim *is* the interstate business: O'Toolis is effectively the sole proprietor of an interstate business, so his funds are not simply personal or private consumer funds with only an "attenuated" connection to interstate commerce. *See id.* at 1025; *United States v. Boulahanis*, 677 F.2d 586, 587, 589–90 (7th Cir.) (finding requisite Hobbs Act connection to commerce where extortion victim, the owner of a Greek social and gambling club, was purchaser of coffee for his club), *cert. denied,* — U.S. ——, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982).[9]

■ Nor does the State's Attorney's furnishing of the funds extorted by Freedman and Moore defeat a Hobbs Act prosecution. *Rindone*, 631 F.2d at 493 is squarely on point and controlling (citations omitted; emphasis in original):

> The most plausible of defendant's arguments is that because the Federal Bureau of Investigation (FBI) supplied the money used in the extortionate transaction, no depletion of the payor's assets was possible and thus the nexus with interstate commerce is not sufficient to invoke Hobbs Act jurisdiction. Defendant's argument, however, fundamentally misreads the Act and the line of judicial interpretation it has spawned.

> The Hobbs Act proscribes not only the acts of obstructing or affecting interstate commerce through extortion but also proscribes "attempts . . . so to do." In short, a section 1951 violation is complete when one attempts to induce a victim engaged in interstate commerce to part with property. . . . Thus, sufficient evidence to prove an attempt to extort has been found even where the payment demand was made but the victim refused to comply. . . . In the present case, Rindone's offense was complete at the time he demanded payment but before the actual transfer of money.

> . . . This court [has] found that "jurisdiction in the particular case is satisfied by showing a realistic probability that an extortionate transaction will have some

---

**8.** They do not demonstrate that illegality of an interstate venture necessarily precludes Hobbs Act applicability (though *United States v. Blakey*, 607 F.2d 779, 782–84 (7th Cir.1979), discussed later in this paragraph of the text, at least hints that may be so). But under the circumstances this Court is not called upon to decide that question.

**9.** *Boulahanis* also shows even the most minimal potential effect on interstate commerce suffices for Hobbs Act jurisdictional purposes. There the extortion victim purchased only $68 worth of coffee per month in interstate commerce. 677 F.2d at 589–90. *See also United States v. Glynn*, 627 F.2d 39, 41 (7th Cir.1980).

effect on interstate commerce" as measured from the time of the offense.

The question here then becomes whether, viewing the evidence in the light most favorable to the government, there is sufficient evidence that would allow a jury to find that a "realistic probability" existed at the time of the payment demand that [the extortion victim] Harper's assets would be depleted by the extortionate transaction. It is undisputed here that Harper, at the time of the transaction, was engaged in interstate commerce.... Thus, the fortuitous use of FBI funds *after* completion of the extortion attempt does not in any way diminish the "realistic probability" that, at the time of the attempt, Harper's assets would be potentially depleted.

So the use of State's Attorney funds clearly does not bar indictment of Freedman and Moore under the Hobbs Act for "attempts" to obtain property from O'Toolis.

### "Did Commit and Attempt To Commit"

*Rindone*'s analysis led this Court to ask the government's attorneys at a status hearing in this action whether the facts alleged can support the conjunctive charges in Counts II to IV that Freedman and Moore "did commit *and* attempt to commit" Hobbs Act extortion. In response the government says (Mar. 2 Mem. 1–3; Apr. 12 Mem. 1) the "did commit" charge is supported by O'Toolis' three payments to Freedman and Moore with State's Attorney funds. But that answer betrays an insufficient understanding of *Rindone*'s implications.

Our Court of Appeals found the use of FBI funds for the extorted payment did not bar Rindone's conviction because an offense was completed under the Hobbs Act when he made the *attempt* to affect interstate commerce by extortion. At the time of that *attempt* there was a realistic probability the contemplated payment would deplete the assets available to Harper for use in interstate commerce, and the actual source of the funds *later* used for the payment had no bearing on assessing that particular probability.

But the corollary of the *Rindone* analysis is that no actual *commission* of Hobbs Act extortion could be charged for the receipt of what were in fact FBI funds. Although Rindone exacted those funds, there was no extortion federally cognizable under the Hobbs Act—for there could be no actual effect on interstate commerce when Rindone obtained FBI dollars, not dollars belonging to interstate enterpriser Harper. Thus only the possibility of convicting Rindone for an extortion *attempt* under the Hobbs Act obviated the government's need to show an actual effect on interstate commerce resulting from extortion of the payment from Harper. To sustain an *attempt*-to-extort conviction, it was sufficient that interstate commerce would have been affected had Rindone received what he in fact demanded: *Harper*'s money.[10]

■ It therefore follows Freedman and Moore cannot be convicted of *committing* Hobbs Act extortion. It may well be, however, that charging a commission and an attempt in the conjunctive is unobjectionable despite the government's apparent intention to prove facts legally sufficient to show only an attempt. Although the Hobbs Act itself treats commissions and attempts in the disjunctive, it is a familiar rule that an indictment "may allege commission of the offense by all the acts mentioned if it uses the conjunctive 'and' where the statute uses the disjunctive 'or.'" 1 Wright, *Federal Practice and Procedure: Criminal 2d* § 125, at 373 (1982).[11]

---

**10.** In effect the government admits the correctness of this analysis. It carefully alleges in Counts I to IV the extortion Freedman and Moore conspired or attempted to commit

"*would* affect" commerce as defined in the Hobbs Act.

**11.** Usually the government drafts its indictments in those terms because it is uncertain

■ It is however unnecessary to decide whether that rule applies here. As the next section demonstrates, Counts I to IV are fatally defective in charging Freedman and Moore conspired and attempted to commit extortion by obtaining money "under color of official right."

### "Under Color of Official Right"

Under Section 1951(b)(2):

> The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Freedman and Moore argue vigorously (Dec. 21, 1982 Motion 4–5; Feb. 7 Mem. 7–[19]; Apr. 7 Mem. 3–7) they could not have acted "under color of official right" as Counts I to IV charge because they were not public officials—as the Indictment alleges, at all material times they were simply licensed attorneys, and in fact they held no official positions.

No assertion is made by the government that attorneys are "public officials" who act professionally "under color of official right." [12] Instead the government contends (Mar. 2 Mem. 6) "the facts of the present case clearly permit a 'color of official right' prosecution of attorneys who extort money from their client based upon their representations that the money will be used to bring about a favorable judicial decision." *See also id.* at 5–6; Jan. 6 Mem. 3–5. That position is supported neither by the Hobbs Act case law nor by the language or the legislative history of the Act.

### 1. Hobbs Act Case Law

Typical Hobbs Act "under color of official right" extortion prosecutions involve de-fendants who were clearly public officials and were acting within the scope of their official duties when they committed their indicted acts. *See, e.g., Hedman,* 630 F.2d at 1187–88 (municipal building inspectors); *Glynn,* 627 F.2d at 40 (municipal electrical inspector); *United States v. Staszcuk,* 517 F.2d 53, 55–56 & n. 3 (7th Cir.) (city alderman), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *see also United States v. Braasch,* 505 F.2d 139, 141, 144, 151 (7th Cir.1974) (policemen performing illegal acts that could be undertaken only because of their positions), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975). But there are several atypical cases, and it is from those the government tries to draw support.

For example, Hobbs Act "official right" extortion convictions have also been upheld where defendant public officials promised favors beyond their legal right or capacity to perform. *See United States v. Price,* 617 F.2d 455, 457 (7th Cir.1979); *United States v. Mazzei,* 521 F.2d 639, 643–45 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Lena,* 497 F.Supp. 1352, 1357 (W.D.Pa.1980), *aff'd without opinion,* 649 F.2d 861 (3d Cir.1981). Such convictions have also been upheld where defendants extorted money (1) after leaving public office, *see United States v. Furey,* 491 F.Supp. 1048, 1066–68 (E.D.Pa.), *aff'd without opinion,* 636 F.2d 1211 (3d Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981), or (2) before entering office, *see United States v. Meyers,* 529 F.2d 1033, 1035–36 (7th Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 253, 50 L.Ed.2d 176 (1976). From those cases the government (Jan. 6 Mem. 4–5) seeks to derive the broad principle a Hobbs Act "official right" prosecution may be maintained

---

what the evidence will show, or what view the jury may take of disputed evidence. In this case there seems no point at all in creating the needless potential of a legal problem, given the impossibility of proving actual (rather than attempted) extortion affecting interstate commerce. If the government tries its hand again, it may well decide to avoid the issue.

**12.** That argument would be untenable. *See Polk County v. Dodson,* 454 U.S. 312, 317–19 & n. 9, 102 S.Ct. 445, 449–50 & n. 9, 70 L.Ed.2d 509 (1981), quoting *In re Griffiths,* 413 U.S. 717, 729, 93 S.Ct. 2851, 2858, 37 L.Ed.2d 910 (1973).

whenever an extortion victim reasonably believes a defendant has effective governmental power and thus can "deliver" on his promise.

It is true the cited opinions contain some statements that, taken out of context, seem to support the government's position. *See, e.g., Lena,* 497 F.Supp. at 1359 ("One who is not himself a public official may extort money under color of official right if he purports to exercise influence over those who are public officials.");[13] *Furey,* 491 F.Supp. at 1067 ("Therefore, the actual power of the defendant is not the issue, but the reasonableness of the belief of the victim under the circumstances as to the defendant's power."). Nevertheless when fairly read the opinions stand for a much narrower proposition: In a Hobbs Act "official right" extortion prosecution, it is enough to show a victim reasonably believes the defendant *himself* has the actual or residual or anticipated official power to deliver on his promises.

Hence in the cases where public official defendants promised favors beyond their official powers, the courts focused on defendants' holding of offices that lent credence to their claimed ability. After all, that would indeed show not "official right" itself, but "color" of the defendants' own "official right." *See Price,* 617 F.2d at 457 (emphasizing defendant's ability to provide improper electrical permits "due to his official position"); *Mazzei,* 521 F.2d at 643 (stressing the reasonableness of the victim's belief the state political system operated to include the effective power to grant state leases within "defendant's office"); and *Lena,* 497 F.Supp. at 1357 (pointing to defendant's "wrongful use of his office"). Even in *Furey,* perhaps the government's

strongest case in the present regard, the court tied the reasonableness of the victim's belief to the fact defendant at least *had* held office (491 F.Supp. at 1067):

> Granted, if the defendant has never occupied an official position and this was known to the victim, then it would be unreasonable for the victim to believe that the defendant had the power to carry out his extortion plans.[14]

And our Court of Appeals made essentially the same point as to the "future" public officials in *Meyers,* 529 F.2d at 1038:

> In short, Meyers and Scoville are charged with having sold the *de jure* power which they would acquire in the future. In the instant case, the motivation for payment by the contractor-victims of Meyers and Scoville thus focused not merely on a *de facto* power of influence-peddling, but on the *de jure* power which Meyers and Scoville would acquire when and after they became trustees. As we said in [*Braasch,* 505 F.2d at 151]:
>
> ... So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951....

In none of the cases was the extortion payment recipient's *own* office an irrelevant consideration.

At one point in the briefing of the current motion, the government relied principally on *United States v. Emalfarb,* 484 F.2d 787 (7th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). *Emalfarb* was a Hobbs Act extortion prosecution of a private citizen who had obtained payments from a trucking company president ("Schreiber") under threat of the use of defendant's power to influence Illinois state police ticketing of the victim's vehi-

---

**13.** *Lena* supported that proposition by citing *United States v. Sander,* 615 F.2d 215 (5th Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). *Sander,* however, involved prosecution for obtaining property by fear of economic loss. *Id.* at 218–19.

**14.** *Furey* reflects a blurring of the line between the two branches of the Hobbs Act (see the later "Statutory Language and Legislative History" section of this opinion). It regularly uses the term "threats" in describing the use of "color of official right" by the defendant public officials in that case. That blurring does not help in the kind of line-drawing required here.

cles. Emalfarb's claimed power derived from his business and personal connection to then Illinois Secretary of State Paul Powell ("Powell") (*id.* at 788). In affirming Emalfarb's conviction our Court of Appeals said (*id.* at 789):

> Defendant also argues that the Government failed to prove a connection between the defendant and the ticketing of Schreiber's trucks. The actual issue to be decided here was not whether the defendant had the power to have Schreiber's trucks stopped and ticketed but whether it was reasonable for Schreiber to believe that he had that power.

That statement apparently lent support to the government's "official right" prosecution of Freedman and Moore for extorting payments based simply on their *claimed* power over the state court judge.

As it turns out, though, the three-count indictment in *Emalfarb* (No. 71 CR 443, N.D.Ill.1971) charged the defendant induced Schreiber's consent "by the wrongful use of fear and under color of official right." Thus it is at least unclear whether the conviction and reported affirmance support the government's exclusive "official right" theory in the present case. Moreover the government's appellate brief in *Emalfarb* makes it apparent the government actually argued a "reasonable fear of economic loss" theory. It used Emalfarb's connection to

Powell only to support the reasonableness of Schreiber's belief Emalfarb could actually inflict an economic toll on him.[15] This Court is not now being asked to decide whether Freedman and Moore may be indicted under a "fear" theory, for the Indictment does not speak in those terms.[16] Upon analysis *Emalfarb* supports the conventional "fear" branch of the Hobbs Act (plainly applicable to extortion by private persons) and not the government's present "official right" theory.

Similarly the government's present theory is not supported by the Hobbs Act extortion prosecution of the private citizen defendant in *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Margiotta was charged on alternate "fear" and "official right" theories, *id.* at 130, and so *Margiotta* is as ambiguous a precedent as *Emalfarb.* Moreover Margiotta was actually charged under 18 U.S.C. § 2(b) ("Section 2(b)")[17] with having "caused" a public official, apparently unwittingly, to participate in the extortionate scheme, and thus Section 2(b) linked the private citizen defendant to official acts. 688 F.2d at 131–33.

Freedman and Moore have not been charged under Section 2(b). But even if it might perhaps be unnecessary to charge defendants specifically under that section (a

---

**15.** *See* Brief for Appellee at 12–15 (citations omitted):

> To support a conviction under 18 U.S.C. § 1951, the government must present evidence 1) that extortion was perpetrated, 2) that the acts perpetrating the extortion were done knowingly and willfully, and 3) that the extortion affected interstate commerce. Extortion is defined as obtaining property from another with his consent, induced by wrongful use of actual or threatened force, violence or fear, or under color of official right. Reasonable fear of economic loss induced by the defendant's acts is sufficient to support an extortion conviction. . . .
>
> Further corroboration of defendant's clandestine use of police power was defendant's conduct at the time Schreiber gave him the first payment. . . .
>
> In the alternative, even if defendant had not caused the ticket harassment, [events] rea-

sonably led Schreiber to believe that defendant had the power to economically harm him. . . . The issue is not whether defendant actually had the power to impose the ticket harassment, but whether Schreiber reasonably believed defendant had that power. The evidence, taken in the light most favorable to the government supports an affirmative finding beyond a reasonable doubt.

**16.** Note the "fear of economic loss" theory is the judicial application of the alternative statutory "fear" term.

**17.** Section 2(b) provides:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

matter open to considerable doubt),[18] the government's attempt to use *Margiotta* as precedent is unavailing: There is simply no allegation here Freedman and Moore *caused* any public official to act in any way whatever, let alone in violation of the Hobbs Act. *See Margiotta,* 688 F.2d at 132.

In summary, judicial extension of Hobbs Act "official right" prosecutions has not been as broad as the government here wishes. Possibly the furthest extension occurred in *Margiotta,* but that case is not applicable where there is no allegation private defendants actually caused a public official to act wittingly or unwittingly in violation of the Hobbs Act. And as the next section reflects, the inapplicability of the "official right" branch of the Hobbs Act to private citizen extortionists is really called for by the language of the Act itself.

## 2. Statutory Language and Legislative History

In purely analytical terms it was perhaps inappropriate to have commenced this discussion where this Court did—with the Hobbs Act case law. After all, we do deal with a statute, and the conventional wisdom is to begin with the statutory language, moving from it only where its meaning is uncertain. This Court departed from that procedure—and its own inclination— only because of the vast body of judicial precedent dealing with Hobbs Act indictments.

But a return to the logical place of beginning surely fortifies the conclusion expressed at the end of the preceding section. Ask any reader of the English language, unencumbered by the encrustation of judicial construction, what is meant when someone is said to have done something "under color of official right." Without question the normal reading of that phrase is that it refers to the actor's *own* "official right." It is a strain on the words to warp them, as the government would have it, to cover the actor's conduct "under color of [*someone else's*] official right."

So it is that the inquiry might well begin and end with the words of the statute. But even if the government is given the benefit of viewing the statutory term as ambiguous (certainly the most to which it is even arguably entitled), the legislative history also answers clearly that only public officials are indictable for extortion "under color of official right."

Section 1951(b)(2)'s definition of "extortion" derives from the Hobbs Act's predecessor, Section 2 of the Anti-Racketeering Act of 1934, 48 Stat. 979, 980 (the "1934 Act"). That statute also provided disjunctively (*id.* at (b)) that a victim's consent might be "induced by wrongful use of force or fear, or under color of official right." [19] At common law extortion could be committed *only* by a public official, and the disjunctive phrasing reflected the 1934 Act's intention to extend the concept to "private" extortion induced by force or fear. *See* Note, *Extortion "Under Color of Official Right": Federal Prosecution of Official Corruption Under the Hobbs Act,* 5 Loyola U.L.J. 513, 518–20 (1974). That limited common-law meaning of "extortion" has been acknowledged by the Supreme Court in interpreting a companion statute to the Hobbs Act, 18 U.S.C. § 1952 (the "Travel Act"), *see United States v. Nardello,* 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487 (1969). And our own Court of Appeals

---

**18.** *Cf. United States v. Tucker,* 552 F.2d 202, 204 (7th Cir.1977), holding it is unnecessary to charge a defendant specifically under 18 U.S.C. § 2(a) as an aider and abettor. It should be noted however that *Margiotta,* 688 F.2d at 131 & n. 25, *contrasted* Section 2(a) with Section 2(b), indicating it would have reached a different result had the government sought to invoke the former rather than the latter.

**19.** There were deficiencies in the 1934 Act as interpreted by the Supreme Court, and the Hobbs Act was designed to remedy them. *See Culbert,* 435 U.S. at 374–78, 98 S.Ct. at 1114–16; *United States v. Enmons,* 410 U.S. 396, 401–08, 93 S.Ct. 1007, 1010–14, 35 L.Ed.2d 379 (1973). Those matters are not relevant to the current discussion.

has recognized both the common-law meaning and the expansion of "extortion" accomplished by the Hobbs Act's repetition of the 1934 Act's formula. *United States v. Crowley*, 504 F.2d 992, 994 (7th Cir.1974), quoting *United States v. Kenny*, 462 F.2d 1205, 1229 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972):

> [While] private persons may violate the statute only by use of fear and public officials may violate the act by use of fear, persons holding public office may also violate the statute by a wrongful taking under color of official right.... The "under color of official right" language plainly is disjunctive. That part of the definition repeats the common law definition of extortion, a crime which could only be committed by a public official and which did not require proof of threat, fear, or duress.

In proper historical context, therefore, Section 1951(b)(2) provides only public officials are indictable for extortion "under color of official right." [20]

In essence the government would now expand the "official right" notion itself to embrace private conduct, despite the fact the authors of the 1934 Act apparently thought an extension of the common law of extortion to embrace "fear" was necessary to achieve that result. Merely stating the

government's goal in that way indicates it really seeks a legislative change in the Hobbs Act—not simply judicial interpretation of the Hobbs Act's notion of acting "under color of official right." If courts are to take seriously the notion a penal statute should put the public on notice what acts are prohibited, *see Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972), it is not this Court's province to rewrite the Hobbs Act to say something it was not intended to say and, when most naturally read, does not mean. So long as this Court is not forced to do so by controlling authority (and it is not), it declines the government's invitation.

### Independence of the Conspiracy Count

Count I does not charge Freedman and Moore *conspired* "under color of official right." *See Meyers*, 529 F.2d at 1035–36. That apparently leads the government to contend (Mar. 2 Mem. 6–9) Freedman and Moore could certainly *conspire* between themselves as charged, even if they themselves could not then act "under color of official right."

But that argument overlooks the fact Count I charges Freedman and Moore conspired to obtain (and did obtain) from

---

**20.** There is no direct discussion of the "under color of official right" provision in the legislative history of the 1934 Act. *See* H.R.Rep. No. 1833, 73d Cong., 2d Sess. 1–2 (1934) (the "House Report"); S.Rep. No. 532, 73d Cong., 2d Sess. 1–2 (1934); *see also* S.Rep. No. 1189, 75th Cong., 1st Sess. 1, 23–24, 41, 50 (1937), a later report summarizing earlier work of the Copeland Committee, originator of the 1934 Act (cited in *Culbert*, 435 U.S. at 375 n. 6, 98 S.Ct. at 1115 n. 6). But Congress' handling of the bills leading to enactment of the 1934 Act nevertheless supports the inference that inducing payment "under color of official right" was understood as an extortion device available only to public officials as a substitute for force or threats. *See Crowley*, 504 F.2d at 995 & n. 5 (approving jury instruction to that effect).

When the Senate predecessor to the 1934 Act was first introduced, it penalized anyone who "extorts or attempts to extort money ..." in connection with commerce. *See* S. 2248, 73d

Cong., 2d Sess. § 2(2), 78 Cong.Rec. 458 (Jan. 11, 1934). In the context of the other provisions of that bill and accompanying bills, *see id.* at 457–58, it is clear the Senate was targeting principally extortionate actions of the violent or physically coercive sort. There was no "official right" provision in S. 2248 at that point or when the Senate first passed the bill. *Id.* at 5,734–35 (Mar. 29, 1934).

It was the House's substitute for S. 2248 that first introduced the "official right" provision. *See* § 2(c), *id.* at 11,402–03 (June 13, 1934); House Report at 1. That House version of S. 2248 was then accepted by the Senate. 78 Cong.Rec. 11,482 (June 14, 1934). Although again there is no direct recorded explanation of the "official right" provision, in context the unmistakable implication is that it provided an alternative theory for proceeding against those who did not *have* to threaten force because they had an alternative club—*their own* "official right."

O'Toolis $3,000 "with his consent, said consent having been induced under color of official right." Thus Count I does not tender for scrutiny whether Freedman and Moore could have conspired to obstruct or affect commerce by *some* form of extortion under the Hobbs Act[21]—what is posed instead is the question whether Freedman and Moore could have conspired to obstruct or affect commerce by "obtaining . . . property . . . under color of official right."

There is no doubt, as the government's citations show (Mar. 2 Mem. 6–7), private citizens are indictable for conspiring *with* public officials who are subject to indictment under criminal statutes directed exclusively at such officials. And it is familiar doctrine a conspiracy may be charged even where a substantive offense is not consummated.

Here, however, there is no allegation Freedman and Moore conspired with any public official. And the issue here is not the presence or absence of a substantive offense following a conspiracy—rather the question is whether Freedman and Moore could conspire to obtain property by inducing O'Toolis' consent "under color of official right."

By analogy to *Rindone,* the government might perhaps have argued that just as a defendant can *attempt* under the Hobbs Act even where there is no actual effect on commerce, so a defendant can *conspire* under the Act even when there is no actual "official right" by which to induce a victim's consent. But the *Rindone* analysis requires a victim actually involved in interstate commerce—that is what creates the "realistic probability" of affecting commerce at the time of the attempt as the defendant conceives it.

By parity of reasoning what is missing here is the actual involvement of a public official, raising a "realistic probability" the conspirators could induce the victim's consent "under color of official right." Just as

a Hobbs Act conspiracy must in itself have an actual link to interstate commerce, *see Mattson,* 671 F.2d at 1025, so must a conspiracy to affect commerce by obtaining property "under color of official right" have an actual connection to a public official. To hold otherwise would require a kind of mysterious levitation—in which Freedman and Moore could conspire only with each other, and with no one else involved, to violate a statute neither could himself violate. This Court has not yet seen that version of the Hindu rope trick.

That logic is confirmed by *Meyers,* 529 F.2d 1033. There the District Court had dismissed a Hobbs Act "official right" extortion conspiracy indictment on the ground the defendants, "mere" candidates for public office, could "not obtain property from another with that person's consent induced under color of official right." 395 F.Supp. 1067, 1070 (E.D.Ill.1975). As our Court of Appeals noted, the district court had mistaken the real issue, which was "whether, within the meaning of the Hobbs Act, it is a crime for candidates for political office to *conspire* to affect commerce by extortion induced under color of official right during a time frame beginning before the election but not ending until after the candidates obtained office." 529 F.2d at 1035 (emphasis in original). On that score the Court said (*id.* at 1036, citation omitted, emphasis in original):

> What [defendants] and the court below overlooked is the crucial factor of *continuity* in the crime of conspiracy. It is well settled that a criminal conspiracy is a continuing crime in that the conspiracy continues until the goal for which it was formed has been attained. . . . Here the object of the conspiracy was the suspension of unbiased judgment in consideration for money received. The object of the conspiracy was not the suspension of the unbiased judgment of a private individual, but was the suspension of the unbiased judgment of a public official.

---

**21.** This Court need not decide that question now.

This point seems to have been missed by the District Court as well as by [defendants].

In view of the foregoing, we conclude that in the instant case the alleged conspiracy to obtain property under color of official right constitutes a crime under the Hobbs Act, even though [defendants] were private citizens at the inception of the conspiratorial agreement.

It was critical to the Court's reasoning that the conspiracy embraced a time when the conspirators were actually public officials who could sell their "*de jure* power," *id.* at 1038. And the necessary implication of that analysis is that Freedman and Moore, neither of whom had either actual public power or any anticipated access to public power, cannot alone have conspired to affect commerce by obtaining property "under color of official right."[22]

### Conclusion

Counts I to IV of the Indictment are dismissed. This action is set for status hearing at 9 a.m. May 26, 1983, at which time the government shall inform this Court of its intentions as to proceeding under the Indictment and the parties shall advise this Court as to their intentions regarding disposition (in that light) of the continued motions to dismiss Counts V and VI.

This Court's last order as to excludable time under the Speedy Trial Act embraced the period ended May 6, 1983 as to each defendant. Both under 18 U.S.C. § 3161(h)(8)(A) and (8)(B)(ii) and under 18 U.S.C. § 3161(h)(1)(F) this Court finds the period commencing May 7, 1983 and ending May 26, 1983 is also excludable.

---

**22.** It will not do to say the facts might support a Hobbs Act conspiracy indictment of Freedman and Moore on another theory. We deal only with the present Indictment, which cannot adequately apprise defendants of the true nature of such an unspecified charge against them. *See Russell,* 369 U.S. at 763–64, 82 S.Ct. at 1049–50.