**UNITED STATES, Plaintiff,**

v.

**Louis MANZO and Ronald Manzo, Defendants.**

Criminal Action No. 09–759 (JLL).

United States District Court, D. New Jersey.

May 18, 2010.

Christopher Gramiccioni, United States Attorney's Office, Newark, NJ, for Plaintiff.

John David Lynch, Union City, NJ, for Defendants.

## OPINION

LINARES, District Judge.

Defendants Louis Manzo and Ronald Manzo have been charged with conspiracy to commit extortion under color of official right in violation of 18 U.S.C. § 1951(a), attempted extortion under color of official right in violation of 18 U.S.C. § 1951(a) and § 2, and travel in interstate commerce to promote, carry on and facilitate bribery in violation of 18 U.S.C. § 1952(a)(3) and § 2.[1] On January 27, 2010, Defendant Louis Manzo submitted several pretrial motions. By letter, also filed January 27, Defendant Ronald Manzo joined in Louis Manzo's motions. This Court held a hearing on the motions on March 23, 2010. In that hearing, the Court disposed of several of the motions and reserved on others. The Court reserved on the following of Defendants' motions: (1) a motion to dismiss Counts 1–4 of the Superseding Indictment based on the argument that Defendants were not public officials covered by the Hobbs Act, (2) a motion to dismiss the Indictment in its entirety based on alleged outrageous government conduct, (3) a motion to compel the Government to produce

---

1. On April 20, 2010, the Government filed a Superseding Indictment against Defendants adding one count of mail fraud in violation of 18 U.S.C. § 1341 and § 2. The Court permitted Defendants to file an additional motion related to this count alone. The newly added count does not affect this Court's ruling on the previously filed motions.

discovery related to the grand jury proceedings, and (4) a motion to compel discovery of a Jack Shaw recording. This Court has considered the arguments presented at the March 23rd hearing and the submissions made in support of and in opposition to Defendants' motions, including a supplemental letter filed by the Government on March 24, 2010. For the reasons set forth below, this Court: (1) grants Defendants' motion to dismiss Counts 1–4 of the Superseding Indictment, (2) denies Defendants' motion to dismiss the Superseding Indictment in its entirety, (3) denies Defendants' motion for discovery of the grand jury proceedings, and (4) denies Defendants' motion for discovery of the requested Jack Shaw recording.

## I. BACKGROUND[2]

In May 2006, Solomon Dwek was arrested by the Federal Bureau of Investigation ("FBI") on bank fraud charges. Mr. Dwek subsequently agreed to become a cooperating witness for the FBI, assisting with an investigation. Part of the FBI's investigation focused on public corruption. As part of the public corruption investigation, Mr. Dwek posed as a real estate developer who was looking for assistance expediting his development projects through local government processes. The investigation resulted in the arrest of numerous individuals, many of whom were New Jersey politicians, on July 23, 2009.

Defendant Louis Manzo was a mayoral candidate in Jersey City, New Jersey, in the spring of 2009. (Superseding Indict-

ment ¶ 1.a.) The mayoral election was held on May 12, 2009; Louis Manzo was unsuccessful. (*Id.*) Prior to his candidacy, he held various public positions, but, at the relevant time of the indictment, he did not hold public office, and there is no allegation that held any other public position at that time. (*Id.*) Defendant Ronald Manzo is Louis Manzo's brother and was his campaign manager and political advisor for the 2009 mayoral campaign. (*Id.*, at ¶ 1.b.)

During the period of Louis Manzo's candidacy, Defendants were introduced to Mr. Dwek by Edward Cheatam and a political consultant, Jack Shaw. Mr. Cheatam[3] and Mr. Shaw informed Mr. Dwek that he "could pay cash to defendant Louis Manzo for his anticipated official assistance" with Mr. Dwek's "purported development projects in Jersey City." (*Id.*, at ¶¶ 7.b., c.)

On or about February 23, 2009, Defendants, Mr. Cheatam, and Mr. Dwek met at a restaurant in Staten Island, New York. (*Id.*, at ¶ 7.d.) The Superseding Indictment alleges that they discussed Mr. Dwek making contributions to Louis Manzo in exchange for expedited development approvals for his real estate projects. (*Id.*) Specifically, the Superseding Indictment alleges that "defendant Ronald Manzo indicated that if defendant Louis Manzo won the mayoral election, there 'shouldn't be any problems' in assisting [Mr. Dwek] with [his] development interests." (*Id.*) After the meeting was over, Mr. Cheatam confirmed with Mr. Dwek that he "should bring $10,000 cash for defendant Louis

**2.** References to the "Superseding Indictment" or "Indictment" refer to the Superseding Indictment filed by the Government on April 20, 2010, which is identical to the indictment on which the present motions are based.

**3.** The Superseding Indictment asserts that, at the relevant time of the indictment, Mr. Cheatam "was the affirmative action officer for

Hudson County and a Commissioner on the Jersey City Housing Authority in Jersey City." (Superseding Indictment ¶ 1.d.) However, for the charges against Defendants, the Superseding Indictment defines the object of the conspiracy as using only Louis Manzo's potential future political office in exchange for property.

Manzo [to] the next meeting." (*Id.*, at ¶ 7.e.) It was agreed that the payment for Louis Manzo should be made through Ronald Manzo. (*Id.*) The Superseding Indictment alleges that "[Mr.] Cheatam reassured [Mr. Dwek] that, in exchange [for the payment], defendant Louis Manzo would assist [Mr. Dwek] in obtaining the discussed development approvals upon his election as Jersey City Mayor." (*Id.*)

Two days later Defendant Ronald Manzo, Mr. Cheatam, and Mr. Dwelt met again in Staten Island. (*Id.*, at ¶ 7.f.) Prior to Ronald Manzo's arrival, the Indictment alleges that Mr. Cheatam told Mr. Dwek that all payments for the benefit of Louis Manzo should be paid to Mr. Cheatam to be passed on to Ronald Manzo. (*Id.*)

"After defendant Ronald Manzo arrived at the meeting, [Mr. Dwek] indicated that [he] was willing to make cash contributions to defendant Louis Manzo, but [that he] wanted to 'come first in line,' did not want to be treated 'like every other developer' in Jersey City, and wanted to be able to provide development plans to Jersey City government officials and demand 'approvals.' " (*Id.*, at ¶ 7.g.) In addition to wanting expedited approvals, Mr. Dwek also discussed his desire that Maher Khalil, an employee of the Jersey City Department of Health and Human Services, be promoted to a higher position in the Jersey City Government (the "Promotion Transaction"). (*Id.*, at ¶¶ 1.e, 6, 7.i.) "Ronald Manzo agreed that the Promotion Transaction constituted a 'separate deal' that would involve a separate cash payment from [Mr. Dwek] in exchange for defendant Louis Manzo's anticipated official action as Jersey City Mayor." (*Id.*, at 7.i.) The parties also continued Mr. Cheatam's and Mr. Dwek's earlier discussion regarding the need to conceal payments from Mr. Dwek. (*Id.*, at ¶ 7.g.) Ronald Manzo "instructed [Mr. Dwek] to refrain from openly discuss-

ing payment matters with defendant Louis Manzo." (*Id.*)

The Indictment further alleges that, later, in the parking lot, "[Mr.] Cheatam, in defendant Ronald Manzo's presence, accepted an envelope containing approximately $10,000 cash from [Mr. Dwek]." (*Id.*, at ¶ 7.j.) Mr. Dwek advised Ronald Manzo that he "was making an 'investment' in [Defendants] in exchange for . . . development approvals." (*Id.*) After the meeting, Mr. Cheatam told Mr. Dwek that he had spoken with Defendants, and that they wanted an additional $15,000. (*Id.*, at ¶ 7.k.)

Both defendants, Mr. Cheatam, and Mr. Dwek met again in Staten Island on or about March 4, 2009. (*Id.*, at ¶ 7.1.) Before Defendants arrived, "[Mr.] Cheatam . . . indicated that [Defendants] would accept $7,500 cash in exchange for defendant Louis Manzo's official support of the Promotion Transaction, with an additional $7,500 cash to be paid after defendant Louis Manzo was elected." (*Id.*) After Defendants arrived, "Louis Manzo confirmed his receipt of the [earlier] $10,000 payment, and further agreed to accept more money from [Mr. Dwek], at a later date, including after the mayoral election, in exchange for the Promotion Transaction and [the real estate development] 'approvals.' " (*Id.*) "At the conclusion of the meeting, defendant Ronald Manzo . . . reiterated the need for [him] to serve as a 'buffer' for defendant Louis Manzo [, and he] further agreed to accept [a] . . . payment of $7,500 for the Promotion Transaction, and additional payments for Louis Manzo's official assistance and support in garnering development approvals . . . ." (*Id.*, at ¶ 7.n.)

The next day, Ronald Manzo met Mr. Cheatam and Mr. Dwek again in Staten Island. (*Id.*, at ¶ 7.o.) The Indictment alleges that he "reassured [Mr. Dwek] that

[Defendants] were 'on the team,' with respect to defendant Louis Manzo's exercising official influence, action and assistance in future Jersey City government matters in [Mr. Dwek's] favor regarding development approvals." (*Id.*) Mr. Dwek told Ronald Manzo and Mr. Cheatam that he "had spoken to [Mr.] Khalil and ... told [Mr.] Khalil that, after the election, [he] would be promoted within Jersey City government." (*Id.*) After the meeting, they all went outside into the parking lot where, "at defendant Ronald Manzo's direction and in defendant Ronald Manzo's presence, [Mr.] Cheatam accepted an envelope containing $7,500 in cash from [Mr. Dwek]." (*Id.*, at ¶ 7.p.) Mr. Dwek said to Ronald Manzo: "[M]ake sure my man [Mr. Khalil] is taken care of." (*Id.*) Ronald Manzo replied that he would. (*Id.*) Mr. Dwek also told Ronald Manzo and Mr. Cheatam "that the $7,500 payment constituted half of the $15,000 payment, and that the remaining $7,500 balance would be paid after [Mr.] Khalil's promotion, to which defendant Ronald Manzo replied 'right'." (*Id.*)

Later that day, Mr. Dwek and Mr. Cheatam had a telephone conversation regarding Louis Manzo's assistance to Mr. Dwek. (*Id.*, at ¶ 7.q.) Mr. Cheatam told Mr. Dwek that "Ronald Manzo stated that, once defendant Louis Manzo was elected, it was 'carte blanche all the way' and that there was 'no problem' with respect to [Mr.] Khalil obtaining a promotion to a higher position within Jersey City municipal government." (*Id.*)

The following month, Ronald Manzo, Mr. Cheatam, and Mr. Dwek met in Bayonne, New Jersey. (*Id.*, at ¶ 7.r.) During this meeting, Ronald Manzo and Mr. Dwek spoke privately. (*Id.*, at ¶ 7.s.) Mr. Dwek said that he would provide another payment for the benefit of Louis Manzo in exchange for expedited approvals. (*Id.*) In

accordance with this conversation, after the meeting Mr. Dwek gave Mr. Cheatam another $10,000. (*Id.*, at ¶ 7.u.) Ronald Manzo accepted this money from Mr. Cheatam. (*Id.*, at 7.v.)

Based on these facts, the Superseding Indictment, in relevant part, alleges that Defendants conspired to and attempted to misuse Louis Manzo's potential future public office by extorting money in exchange for cash payments—$10,000 on February 25, 2009, $7,500 on March 5, 2009, and $10,000 on April 23, 2009.

## II. DISCUSSION

### A. Motion to Dismiss Counts 1–4 of the Superseding Indictment

An indictment is deemed "sufficient so long as it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir.2007) (internal quotations omitted). "Moreover, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Id.* In evaluating the sufficiency of an indictment, allegations in the indictment are assumed to be true, *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir.1990), and a court is to use "a common sense construction" of the charges, *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir.2000).

Count 1 of the Superseding Indictment charges Defendants with conspiracy to commit extortion under color of official right in violation of the Hobbs Act. Counts

2–4 charge Defendants with attempted extortion under color of official right related to the acceptance of the three payments from Mr. Dwek in exchange for Louis Manzo's potential future official action.

The Hobbs Act provides:

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.*, at § 1951(b)(2). "Thus, the statute supports two classes of extortion: extortion induced by 'wrongful use of force' and extortion 'under color of official right.'" *United States v. Urban,* 404 F.3d 754, 768 (3d Cir.2005). For extortion under color of official right, public office satisfies the coercive element. *United States v. Mazzei,* 521 F.2d 639, 645 (3d Cir.1975).

For the Government to prove a violation of the Hobbs Act using the "under color of official right" theory, the Supreme Court has held that it "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans v. United States,* 504 U.S. 255, 268, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992); *see also Urban,* 404 F.3d at 767. Because a Hobbs Act "offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts[,] fulfillment of the quid pro quo is

not an element of the offense." *Evans,* 504 U.S. at 268, 112 S.Ct. 1881. As a result, the Government does not have to prove that the public official "had the actual [d]e jure power" to fulfill the promise, *Mazzei,* 521 F.2d at 645, or "that the public official [actually] acted or refrained from acting as a result of payments made," *Urban,* 404 F.3d at 768. In other words, the Hobbs Act "under color of official right" theory criminalizes exchanges coerced by the "wrongful use of office," without reference to whether the promises of official acts which underlie the exchanges do or could come to fruition. *See Mazzei,* 521 F.2d at 643, 645; *see also United States v. Antico,* 275 F.3d 245, 257 (3d Cir.2001).

Defendants argue that Counts 1–4 of the Superseding Indictment should be dismissed because "they charge [Defendants] with conduct outside the precise scope of the [Hobbs Act]" in violation of their due process rights. (Louis Manzo's Mots. in Limine (joined in by Ronald Manzo) [hereinafter "Defs.' Br."], at 15.) First, they argue that they are non-public official individuals and that, to act "under color of official right" within the meaning of the Hobbs Act, a "defendant must qualify as an official, that is, ... be in some position [of] authority, at the time that payment was accepted." (*Id.*, at 18.) They argue that this is true even if they are charged only with conspiracy or attempt versus a substantive Hobbs Act violation. Next, they argue that their conduct did not "affect interstate commerce" because the mayoral election was for a municipal, local office and because the project at issue was fictitious.

### 1. *Public Official Argument*

At the time of the incidents alleged in the Indictment, Louis Manzo was a candidate for mayor of Jersey City; Ronald

Manzo was his campaign manager and advisor. Neither defendant held public office at that time or is alleged to have held any other public position. In fact, at the March 23rd hearing, the Government stated that "[Louis] Manzo was never a public official[;][h]e was a candidate." (March 23, 2010 Hearing, Tr. 29:19–20.) For this and other reasons, the Government stated: "[W]e couldn't charge [the substantive act of extortion]." (*Id.*, at 29:16–19.)[4] However, the Government argues that the Superseding Indictment does sufficiently charge the inchoate offenses of conspiracy and attempt under the Hobbs Act. (*See id.*, at 33:25–36:1 ("The fact that they are not a public official is not a defense [to the charges as indicted].").) Thus, the Government argues "the real issue in the case [is] whether, under the Hobbs Act, it is a crime for candidates for public office to conspire to affect commerce by extortion induced under color of official right during a time frame beginning before the election." (Mem. of Law of the United States in Opp'n to Pre–Trial Mots. of Defs. Louis Manzo and Ronald Manzo and in Support of Its Cross–Mot. for Reciprocal Discovery [hereinafter "Gov't. Opp'n"], at 11.) The Government asserts that the answer to this question is yes; it says: "Conspiring or attempting to obstruct commerce by obtaining property by extortion under color of official right constitutes a crime under the Hobbs Act, even if the Defendants were private citizens at the inception of the conspiratorial agreement." (*Id.*, at 16.)

In arguing that Counts 1–4 properly allege Hobbs Act violations, the Government focuses on several general concepts: (1) that the Hobbs Act encompasses conduct by private individuals, not only public officials; (2) that the Hobbs Act covers exchanges related to future assistance or influence, not only present exercises of official power; and (3) that there are different proof requirements for a substantive Hobbs Act charge versus an inchoate charge, such as conspiracy or attempt. The Government argues that the law for each of these concepts is clear and, that, therefore, it is clear that the conduct by Defendants in this case, non-public official individuals accused of conspiracy and attempt to trade potential future official action for money, is covered by the "under color of official right" prong of the Hobbs Act.

For the most part the Court agrees with the Government's broad general statements of the law. The Government argues that "the Hobbs Act is explicit in the fact that it covers not just public officials, but *anyone* who, in any way or degree, 'affects commerce ... by robbery or extortion, or attempts or conspires to do

---

**4.** There is language in some cases that implies that the term "public official" under the Hobbs Act includes both individuals currently in public office and individuals "in the process of becoming a public official." *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005); *see also United States v. Tomblin*, 46 F.3d 1369, 1382 (5th Cir.1995). None of these cases actually involved a person alleged to be "in the process of becoming a public official" and all can be traced back to the Seventh Circuit's decision in *United States v. Meyers*, 529 F.2d 1033 (7th Cir.1976), which involved a candidate for office who was subsequently elected and, thus, became a public official during the period of time charged in the indictment. As noted above, the Government in this case stated that Defendants were not "public officials;" it did not make the argument that candidates are individuals who could be covered by the Hobbs Act because a candidate is a person in the process of becoming a public official. Therefore, the Court does not express an opinion on who this phrase may cover, if appropriate at all under the Hobbs Act. It could simply mean individuals "who had been elected to public office but had not yet assumed office." *See United States v. Furey*, 491 F.Supp. 1048, 1066 (E.D.Pa.1980).

so.'" (Gov't Opp'n, at 15 (quoting 18 U.S.C. § 1951(a)) (emphasis and alteration in original).) The statute is clear that non-public official individuals properly may be charged with Hobbs Act violations. *See, e.g., Evans,* 504 U.S. at 263–64, 112 S.Ct. 1881 ("[T]he present statutory text is much broader than the common-law definition of extortion because it encompasses conduct by a private individual as well as conduct by a public official."). But, the general rule is that "private persons may violate the statute only by use of fear [while] public officials may violate the act by use of fear ... [or] by a wrongful taking under color of official right." *United States v. Kenny,* 462 F.2d 1205, 1229 (3d Cir.1972); *see also United States v. Abbas,* 560 F.3d 660, 664 (7th Cir.2009) ("Our understanding of 'under color of official right' liability, then, must begin with the notion that ordinarily the phrase applies to public officials who misuse their office."). In other words, the general rule is that only public officials may be charged using the "under color of official right" theory. *Kenny,* 462 F.2d at 1229; *see also Saadey,* 393 F.3d at 674 ("As a general matter, prosecuting private citizens under the 'color of right' theory of extortion is inappropriate under the Hobbs Act, irrespective of the actual influence that private citizen purports to maintain over government officials."); *United States v. McClain,* 934 F.2d 822, 831 (7th Cir.1991) ("[A]s a general matter ... proceeding against private citizens on an 'official right' theory is inappropriate under the literal and historical meaning of the Hobbs Act."). Notwithstanding this general rule, courts over the years have fashioned several exceptions, permitting private individuals to be charged using the "under color of official right" theory. For example, in the Sixth Circuit, a private citizen may be convicted of Hobbs Act extortion "if that private citizen either conspires with, or

aids and abets, a public official in the act of extortion." *Saadey,* 393 F.3d at 675. Other circuits have reached similar results. *See, e.g., United States v. McFall,* 558 F.3d 951, 958–59 (9th Cir.2009); *Tomblin,* 46 F.3d at 1382; *McClain,* 934 F.2d at 830.

■ Next, the Court agrees that promises of future official action can violate the Hobbs Act. In a certain sense, all Hobbs Act violations involve future official action because a Hobbs Act "under color of official right" offense is complete upon the exchange of property for some promise of official action. To the extent that the Government is arguing that the Hobbs Act covers future, less specific or certain actions, the Court also agrees that such promises may violate the Hobbs Act. "The Government may establish extortion under a 'stream of benefits' theory." *United States v. Delle Donna,* No. 07–784, 2008 WL 3821774, at *3, 2008 U.S. Dist. LEXIS 61443, at *8 (D.N.J. Aug. 12, 2008) (citing *Kemp,* 500 F.3d at 282), *aff'd,* 366 Fed. Appx. 441 (3d Cir.2010) (unpublished). Under this theory, the Government may charge a Hobbs Act violation where a public official takes property in exchange for acting as if he is "on retainer" for future generalized assistance or influence. *See Delle Donna,* 366 Fed.Appx. at 450 (citing *Kemp,* 500 F.3d at 282). For example, the Hobbs Act would cover a promise by a public official to expedite any development approvals that may be filed in the future by a particular developer. So, some promises of potential future official action are within the scope of the Hobbs Act.

■ Finally, the Court acknowledges the distinction between a substantive charge and one for conspiracy or attempt. For example and most relevant to the arguments made by the parties in this case, the crimes of conspiracy or attempt do not require "that the ends of the con-

spiracy were from the very inception of the agreement objectively attainable." *See United States v. Hsu,* 155 F.3d 189, 203 (3d Cir.1998) (quoting *United States v. Jannotti,* 673 F.2d 578, 591 (3d Cir.1982)). In other words, impossibility is not a defense to a conspiracy or attempt charge. Thus, although a substantive Hobbs Act charge requires a showing of some potential effect on interstate commerce, a charge of conspiracy or attempt does not require such proof; a fictitious project with no possible effect on interstate commerce due to its fictitious nature is enough. *See Urban,* 404 F.3d at 766; *Jannotti,* 673 F.2d at 591, 594.

These concepts, in a general sense, are uncontroversial. However, the Court disagrees with the Government that a finding that the law is clear as to these broad concepts makes the application of that law to the specific facts of this case equally clear. In fact, the Government stated at the March 23rd hearing that it knows of only one case, *United States v. Meyers,* 529 F.2d 1033 (7th Cir.1976), that is factually similar to the present case. (*See* Hearing Tr. 35:18–24). Defendants argue that there is no case on point; they argue that *Meyers* is distinguishable and, thus, the present case presents a novel question for this Court. Because a novel question of application of a criminal statute is presented here, they argue that the rule of lenity requires that the Court side with Defendants' interpretation. The Government argues that the rule of lenity is not applicable here because the Hobbs Act statute is not ambiguous. (Gov't Opp'n, at 15 (citing *United States v. Culbert,* 435 U.S. 371, 379, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978) ("Congress has conveyed [the Hobbs Act's] purpose clearly.")).)

"[W]hen there are two rational readings of [a] criminal statute, one harsher than the other, [courts] are to choose the harsh-er only when Congress has spoken in clear and definite language." *United States v. Murphy,* 323 F.3d 102, 111 (3d Cir.2003) (quoting *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)). The Supreme Court has recently held:

> The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*United States v. Santos,* 553 U.S. 507, 128 S.Ct. 2020, 2025, 170 L.Ed.2d 912 (2008) (internal citations omitted). The Supreme Court also has "made clear that the rule of lenity applies to ambiguous applications of the Hobbs Act." *McFall,* 558 F.3d at 957 (citing *Scheidler v. NOW, Inc.,* 537 U.S. 393, 408–09, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003)); *see also United States v. Brock,* 501 F.3d 762, 768 (6th Cir.2007). In *Scheidler,* the Supreme Court noted that it had previously "said that the words of the Hobbs Act 'do not lend themselves to restrictive interpretation' because they 'manifest ... a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'" 537 U.S. at 408, 123 S.Ct. 1057 (quoting *Culbert,* 435 U.S. at 373, 98 S.Ct. 1112). But, the Court reconciled this statement in *Culbert* with another prior decision that declined to expand the interpretation of the Hobbs Act, *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). The Court

differentiated between an argument that a defendant's "acts did not affect interstate commerce," like was made in *Culbert,* and an argument where a defendant asserted that his "acts did not amount to the crime of extortion as set forth in the [Hobbs] Act," like was presented in *Scheidler. Id.,* at 408–09, 123 S.Ct. 1057. Applying the rule of lenity, the Supreme Court in *Scheidler* declined to expand the Hobbs Act's definition of property, stating that "such a significant expansion of the law's coverage must come from Congress, and not from the courts." *Id.,* at 409, 123 S.Ct. 1057.

Although Defendants do make an argument that their conduct could not have affected interstate commerce, they primarily argue that, as non-public official individuals, they could not have been acting "under color of official right" within the meaning of the Hobbs Act. This Court agrees with Defendants that, unless the statute is clear that Defendants' conduct is within its scope, the rule of lenity requires that any ambiguity be resolved in their favor.

"In this case, the Government submits [that] the goal [of the conspiracy] was obtaining ... money in exchange for a representation that [Louis] Manzo was going to suspend his unbiased judgment upon being installed in office." (Hearing Tr. 34:8–12.) Specifically, the Government charges that "in return for the corrupt cash payments and illicit political contributions obtained, and to be obtained, from [Mr. Dwek], defendants Louis Manzo and Ronald Manzo agreed to use defendant Louis Manzo's official influence and assistance, upon being elected as Mayor of Jersey City, to: (i) obtain certain development approvals on [Mr. Dwek's] behalf ...; and (ii) promote [Mr.] Khalil to a higher position within Jersey City government." (Superseding Indictment ¶ 6.) The Government argues that the Seventh Circuit's *Meyers* decision supports its argument that the Hobbs Act covers this conduct where the charges are for conspiracy and attempt.

In *Meyers,* the Seventh Circuit held that it was "no less of a crime under the Hobbs Act to sell one's public trust before, rather than after, one is installed in public office." 529 F.2d at 1038. The indictment in that case

> allege[d] that a conspiracy was entered into at a time when [the defendants] were candidates for public office, that the alleged conspiracy did not end until at least May of 1973, at which time [the defendants] had been public officials for several months, and that through May of 1973, [the defendants] ... retained the money they had earlier obtained ....

*Id.,* at 1036. Based on these allegations, the court stated that the issue before it was "whether, within the meaning of the Hobbs Act, it is a crime for candidates for political office to *conspire* to affect commerce by extortion induced under color of official right during a time frame beginning before the election *but not ending* until after the candidates have obtained public office." *Id.,* at 1035 (italics emphasis in original, underline emphasis added). While acknowledging that the defendants "were private citizens at the inception of the conspiratorial agreement," the Court nevertheless answered this question in the affirmative, "hold[ing] that the conspiracy of [the defendants] as charged in the indictment constitute[d] a crime within the meaning of the Hobbs Act." *Id.,* at 1036, 1038.

At least three courts that have considered *Meyers,* including a subsequent Seventh Circuit case, have framed the *Meyers* holding as one based not only on the difference between a substantive and a conspiracy or attempt charge under the Hobbs Act, but also on the alleged fact

that the conspiracy continued during a time when the defendants were actually public officials. *See United States v. Forszt*, 655 F.2d 101, 104 (7th Cir.1981) ("[I]n *United States v. Meyers*, we held that it was a violation of the Hobbs Act for a *public official* to sell his public trust before being installed in office.") (emphasis added, citation omitted); *see also United States v. Finley*, 705 F.Supp. 1272, 1281 (N.D.Ill.1988) ("The [*Meyers*] court held that [the defendants] could be convicted under the 'official right' prong, even though they were not public officials when they accepted the money, because the defendants were charged with conspiracy rather than the substantive offense *and because the alleged conspiracy continued during the time that the defendants held actual office*") (emphasis added); *United States v. Freedman*, 562 F.Supp. 1378, 1390 (N.D.Ill.1983) ("It was critical to the [*Meyers*] Court's reasoning that the conspiracy embraced a time when the conspirators were *actually public officials* who could sell their 'de jure power.'") (emphasis added). In accord with its interpretation of *Meyers*, the Seventh Circuit in *Forszt* held "that it [also] is unlawful for a *public official* to sell his public trust *while in office* even though the last installment for the services rendered is to come after he leaves office." *Forszt*, 655 F.2d at 104. In *Forszt*, the Seventh Circuit again was willing to extend the period of criminality for a conspiracy charge to encompass a time period where a defendant was not a public official, so long as the charged conspiracy time frame contained a period when the defendant was actually in office.

This Court finds that *Meyers* is distinguishable from the present case. The Government concedes that Defendants were not public officials at the inception of the conspiratorial agreement as charged.

The Government also asserts that "[t]he goal of the conspiracy was attained when the money was received [from Mr. Dwek]," a time when Defendants also were not public officials. (Hearing Tr, 34:11–12; *see also* Gov't Opp'n, at 13.) Thus, at no time during the period of the charged conspiracy or the time of the alleged extortion attempts, "January 2009 to in or about April 2009," (Superseding Indictment ¶ 2) (of both the conspiracy and attempt charges), were either defendant alleged to be public officials or have any other actual public position. Nor does the Superseding Indictment charge them with conspiring to use another official's office or influence in exchange for the money they received. The Superseding Indictment focuses the conspiracy and attempt charges solely on the allegation of misuse of Louis Manzo's potential future political office. Therefore, the Government has presented no case factually on point to the present case, and this Court has not found one.

While this weighs against the Government's position, it is not alone dispositive of whether Defendants' conduct, as alleged, may be criminal under the Hobbs Act; a novel situation may still present a clear violation of a statute. Thus, the question here is whether it is clear under the Hobbs Act that a candidate may be charged with conspiracy and attempted extortion under the color of official right where the indictment does not allege that he was conspiring with or aiding and abetting another public official in the misuse of that official's office, but instead only is charged with conspiring and attempting to extort property in exchange for the promise to misuse his own potential future political office. For the reasons that follow, this Court finds that such conduct is not clearly within the scope of the Hobbs Act even if only conspiracy or attempt is charged.[5]

The Government appears to believe that charging "conspiracy" or "attempt" is a legal alchemy with the power to transform any gap in the facts into a cohesive extortion charge. While such inchoate charges may be sufficient to stretch a period of the conspiracy to a time frame where public official defendants were not public officials, or also may be sufficient to fill the interstate commerce requirement where the exchange involved a fictitious project, the Court finds that they are not so magical as to altogether substitute for the coercion required by the statute. This is not to say that a threat to use potential future political power may never be sufficiently coercive to be extortion as covered by the Hobbs Act, but rather that the Government's interpretation of the Hobbs Act is not so definite and clear as to override this Court's rule of lenity concerns, especially in the context of .politics and elections. *See Murphy*, 323 F.3d at 116 ("[The] rule of lenity concerns are particularly weighty in the context of prosecutions of political officials, since such prosecution may chill constitutionally protected political activity."). As the Supreme Court said in *Scheidler*, such a significant expansion should come from Congress.

■ The Hobbs Act criminalizes *coercive exchanges*, without reference to the occurrence of actual official action. Thus, to the extent that the Government sometimes argues that the ends of the alleged conspiracy here focus on potential future

official action by Louis Manzo as a public official, this argument misses the mark for an "under color of official right" Hobbs Act charge. Under the Government's theory, no coercion is required if it merely charges conspiracy or attempt. But, the *end* of a Hobbs Act crime executed under color of official right is the *exchange* of a promise of official action for the receipt of property, not the subsequent action that may or may not occur. Those ends may be what the parties desire, but it is the exchange that is the focus of a Hobbs Act charge. Thus, to not require coercion at the time of the agreement or exchange is to read out this requirement altogether. Such an interpretation is not clearly within the scope of conduct covered by the statute. Coercion in some form is at the heart of any Hobbs Act violation, and, for the "under color of official right" theory, political office or power is what provides the coercion. *See Mazzei*, 521 F.2d at 645. Recently, in *Abbas*, the Ninth Circuit stated:

> Victims of this type of extortion are vulnerable based on the authority that their victimizer wields. And what makes extortion under color of official right so pernicious is that the state ... has given the offender the power to harm his victims. For this reason, such an offender is singled out for a special brand of criminal liability.

560 F.3d at 664. The Court finds that a coercion gap in the facts is not of the same type as that created by a fictitious project and its possible effect or lack thereof on

---

5. The Court notes that the Supreme Court in *Evans*, after an analysis of the statutory text and legislative history of the Hobbs Act, stated that "the portion of the statute that refers to official misconduct continues to mirror the common law definition." 504 U.S. at 264, 112 S.Ct. 1881. The Supreme Court has also said that "[e]xtortion necessarily involves the use of coercive conduct to obtain property." *Scheidler*, 537 U.S. at 407–08, 123 S.Ct. 1057.

As discussed above, under the common law "extortion [was] a crime which could only be committed by a public official, and which did not require proof of threat, fear, or duress." *Kenny*, 462 F.2d at 1229. Also as discussed above, the Third Circuit has stated: "Under the common law definition, color of public office took the place of the coercion implied in the ordinary meaning of the word extortion." *Mazzei*, 521 F.2d at 645.

interstate commerce, as was addressed in *Jannotti*.

In *Jannotti* the Third Circuit found that "Congress can constitutionally reach inchoate offenses because these offenses pose a potential threat to interstate commerce." 673 F.2d at 592. In accepting this position, the Court noted that "Defendants have been able to offer this court no policy reason for us to accept their restrictive view of Congress' constitutional power to legislate as to conspiracies which pose a threat to interstate commerce." *Id.*, at 594. It stated that it could "see no reason to interpret Congress' legislative power as dependent upon whether the F.B.I. agents actually contract for a hotel site, purchase machinery to dump garbage, or establish their own fencing operation for the purchase of stolen goods." *Id.* In other words, the Third Circuit was presented with no countervailing reason to restrict the application of the Hobbs Act based on a mere technicality that had no real bearing on the criminal intent at issue. Defendants put forward two compelling reasons for drawing a different line when dealing with the "under color of official right" coercion element at issue here.

First, Defendants argue that, to the extent that candidates should be criminally liable for conduct like that charged here, Congress has already provided a different, lesser charge. Section 599 of the criminal code, "Promise of appointment by candidate," provides:

> Whoever, being a candidate, directly or indirectly promises or pledges the appointment, or the use of his influence or support for the appointment of any person to any public or private position or employment, for the purpose of procuring support in his candidacy shall be fined under this title or imprisoned not more than one year, or both; and if the violation was willful, shall be fined under

this title or imprisoned not more than two years, or both.

18 U.S.C. § 599. In this case, at least in part, Defendants are charged with accepting money in exchange for the promise to promote Mr. Khalil to a higher position in the Jersey City government, which is conduct arguably within this statute. While certain conduct may violate more than one criminal statute, the Court is persuaded by Defendants' argument that this statute indicates that Congress contemplated candidate liability for trading such favors and determined that this conduct warranted lesser liability than that designated under the Hobbs Act.

This is not unusual in our criminal system. Our criminal code recognizes that changes in factual situations can subject individuals to different potential criminal liability. For example, under traditional burglary statutes, punishment was different depending on the nature of the structure involved or the time of day. The same actions could be subject to different criminal liability if the structure was a house versus a commercial structure or if it was night versus day. Contrary to the Government's assertions, a finding that Defendants' behavior is not clearly within the scope of the Hobbs Act does not grant candidates "immunity" in the event they are not elected. First, it is not immunity to find that conduct that the Government would like to charge is not actually covered by the criminal statute under which they seek to prosecute. Second, a finding that Defendants' conduct may not properly be charged under the Hobbs Act says nothing about whether it is subject to criminal liability under other statutes. Arguably, § 599 suggests that Congress contemplated candidate liability and views trading favors by candidates as warranting lesser criminal liability than the special brand of

criminal liability that is meted out for *extortion* under the Hobbs Act.

Defendants also persuasively argue that, unlike in *Jannotti* where no countervailing policy reason was presented for the Government's position, accepting the Government's position here could invade an area of potentially protected political speech. For example, must an individual be a viable candidate? Could an applicant for public employment be covered by the statute? To this end, the Court, at the March 23rd hearing, asked the Government if, using its interpretation of the Hobbs Act, "Howard Stern runs for President, and he takes [a] $5,000 ... bribe, and he says, 'When I get in [office], I'm going to make [Robin Quivers] Vice President—Secretary of State,' " could Mr. Stern be charged as the Defendants here have been charged? (Hearing Tr. 27:4–7.) The Government answered in the affirmative. (*Id.*, at Tr. 27:8.) While this Court finds that Defendants' actions are not the same as this hypothetical, it also believes that the Government's answer highlights the difficulty of drawing a line or creating boundaries for criminal liability where a statute is not clear and the potential scope is very broad. *See McClain*, 934 F.2d at 831 ("[A]n undue expansion of the 'color of official right' concept might sweep so broadly as to implicate payments to influential lobbyists."). *Cf. Murphy*, 323 F.3d at 117 (applying the rule of lenity in the context of a charge for honest services mail fraud and discussing its concerns about potentially overbroad applications of the statute).

The Government's answer to this boundary drawing question is to leave it for the jury. (*See* Hearing Tr. 27:23–28:2.) While certain questions, such as whether a victim's belief in a defendant's power was reasonable under certain fact scenarios, are appropriate for the jury, *see Furey*, 491 F.Supp. at 1067, this Court finds that

the threshold question of who is enough like a public official to be within the scope of the "under the color of official right" theory is not appropriately left to the jury, *cf. Murphy*, 323 F.3d at 114 ("[T]he idea of allowing a jury to determine whether a party official acted enough like a government official is itself enough to give us pause ....."). Leaving to the jury this threshold question of who may be subject to criminal liability under the statute would provide inadequate notice of the scope of liability.

This Court is also persuaded, after a review of the case law dealing with the private individual versus public official distinction, that the law is insufficiently clear that the conduct, as presently charged in the Superseding indictment, falls within the scope of the Hobbs Act even if only inchoate crimes are charged. For example, in *United States v. Collins*, the defendant, the husband of the governor of Kentucky who did not himself hold office, was charged with conspiring with government officials, in particular Lester Thompson, the Kentucky Secretary of Finance, and attempt to extort payments from state contractors. 78 F.3d 1021, 1026–27 (6th Cir.1996). He argued that he could not be charged with these crimes for the full period of the indictment because the conspiracy and attempt period included a portion of time where Mr. Thompson was no longer the Secretary of Finance. *Id.*, at 1031. The Court did not dismiss this argument out of hand noting that only inchoate offenses had been charged. Instead, it found that the charges were appropriate because there were sufficient allegations and evidence that, throughout the period charged, the defendant conspired with some public officials for the misuse of their official power. *Id.*, at 1031–32. On the other hand, in *Saadey*, the Sixth Circuit reversed a conviction for attempted extortion under color of official right where the

government conceded that the defendant was not a public official at the time of the alleged attempt and he had not been charged with aiding and abetting another public official to extort money. 393 F.3d at 675–76. The defendant previously had been an investigator with the prosecutor's office, but, at time covered by the charge, he was a private citizen. *Id.*, at 672–73. Even though he sought money under the pretense that he could assist in having pending charges reduced, the court found that the attempted extortion charge was improper. *Id.*, at 673–74

In *Abbas*, the Seventh Circuit recently held that a person who impersonated an FBI agent was not acting "under color of official right" because he did not have any actual position or authority. 560 F.3d at 665. In *Freedman*, a Northern District of Illinois court dismissed charges of conspiracy and attempt extortion under color of official right because, although the attorneys in the case had held out that the money they sought would be used to bring about favorable judicial decisions, they were not themselves public officials and so could not be acting "under color of official right." 562 F.Supp. at 1379, 1384–86.

This Court has not found, and the Government has not pointed to, any case where the public official element is missing regardless of whether a substantive or an inchoate crime has been charged. Always present in these cases is the misuse of some present, not hypothetical, public office or official position. *See Abbas*, 560 F.3d at 665 ("Extortion under color of official right is a crime that punishes those who betray the public trust[,][b]ut the term presumes that the 'official' has actually been entrusted with authority by the public."); *United States v. Freeman*, 6 F.3d 586, 593 (9th Cir.1993) ("[T]he Hobbs Act reaches anyone who actually exercises official powers, regardless of whether

those powers were conferred by election, appointment, or some other method."); *Furey*, 491 F.Supp. at 1067, *aff'd without opinion*, 636 F.2d 1211 (3d Cir.1980) ("[I]f the defendant has never occupied an official position and this was known to the victim, then it would be unreasonable for the victim to believe that the defendant had the power to carry out his extortion plans.").

For all of these reasons, this Court finds that Defendants' conduct, as currently charged in the Superseding Indictment, is not clearly within the scope of the Hobbs Act using the "under color of official right" theory. Therefore, the rule of lenity requires that any ambiguity be resolved in Defendant's favor. Counts 1–4 of the Superseding Indictment are dismissed.

### 2. *Interstate Commerce Argument*

Defendants argue that their conduct did not "affect interstate commerce" because the election was for a municipal, local office and because the project at issue was fictitious. Because this Court has dismissed Counts 1–4, it need not reach Defendants' alternative interstate commerce argument for dismissal of these counts. However, for completeness and because this issue may arise in other related cases, the Court will briefly address this argument.

The Third Circuit has held that only "proof of a [potential] *de minimis* effect on interstate commerce is ... required." *Urban*, 404 F.3d at 766 (discussing the *Lopez-Morrison-Jones* trilogy of Supreme Court cases). There is no requirement that the Government show some larger interstate or national effect on commerce. Thus, the fact that the office at issue here was a local one is not dispositive. The Superseding Indictment describes large scale real estate development activity that is alleged to

have an interstate effect. This is sufficient.

Additionally, Defendants' argument that the fictitious nature of the project precludes a Hobbs Act charge is also erroneous. The Third Circuit in *Jannotti* made clear that a project need not be real to satisfy the interstate commerce element where inchoate crimes are charged. 673 F.2d at 591, 594. Therefore, this Court finds that the Superseding Indictment alleges a sufficient interstate commerce effect for the charges brought here.

**B. Motion to Dismiss the Superseding Indictment in its Entirety**

 Defendants argue that "the conduct of the Government and its agents [was] so outrageous that it violates [their] constitutional due process rights." (Defs.' Br., at 27.) "The defense of outrageous government conduct examines whether a defendant's due process rights have been violated because the government created the crime for the sole purpose of obtaining a conviction." *United States v. Pitt*, 193 F.3d 751, 759–60 (3d Cir.1999). To succeed, a defendant must show that the government engaged in conduct that was "shocking, outrageous and clearly intolerable." *United States v. Nolan–Cooper*, 155 F.3d 221, 231 (3d Cir.1998). Although this defense is still recognized in theory, the Third Circuit has noted that *United States v. Twigg* is "the only case in which the Government's conduct has offended due process." *United States v. Lakhani*, 480 F.3d 171, 182 (3d Cir.2007). In *Twigg*, a government informant initially contacted a defendant and "deceptively implanted the criminal design in [the defendant's] mind." 588 F.2d 373, 381 (3d Cir.1978). The government agent then "set him up, encouraged him, provided the essential supplies and technical expertise, and … assisted [him] in finding solutions [when he

encountered difficulties.]" *Id.* The Third Circuit barred the prosecution, finding that this level and type of government involvement crossed the line of acceptable conduct. *Id.*

Since *Twigg*, the Third Circuit has declined to accept an outrageous conduct defense even in cases where the government has actively been involved with the defendants in the illegal activity. For example, in *United States v. Beverly*, a government agent approached the defendants saying that he was looking for someone to burn down a building. 723 F.2d 11, 12 (3d Cir.1983). The defendants agreed to do the job. *Id.* For its execution, the government agent provided materials, including the gasoline and matches, and drove the defendants to the building. The agent watched as they attempted to burn the building down. *Id.* The Third Circuit rejected an outrageous conduct defense. *Id.*, at 13. Although the *Beverly* Court expressed "grave doubts about the propriety of [the] tactics," it nonetheless held that the government's behavior did not "shock the conscience of the court." *Id.*

 Unlike *Twigg*, in this case it was a co-conspirator, Mr. Cheatam, and not government agents or its cooperating witness, who drew Defendants into the alleged illegal activity. Additionally, once approached, the Superseding Indictment alleges that Defendants readily became active participants in the scheme to extort money in exchange for potential future official action. The allegations show that, from the first meeting, Defendants demonstrated an immediate willingness to be a part of the scheme. Therefore, especially given the extraordinary nature of the defense and its very limited application in this circuit, this Court finds that the facts presented here are not comparable to those presented in *Twigg*. Defendants' motion to dismiss the Superseding Indict-

ment based on outrageous government conduct is denied.

### C. Motion for Discovery of the Grand Jury Proceedings

Defendants argue that "[b]ecause the indictment alleges facts that do not fit comfortably within the Hobbs Act, the grand jury may have been swayed by the Government's improper legal instructions." (Defs.' Br., at 25.) Therefore, they request discovery of the grand jury proceedings "to resolve critical questions regarding the integrity of this prosecution." (*Id.*, at 26.) Because this Court has dismissed the Hobbs Act charges in the Superseding Indictment, the question of the instructions to the Grand Jury related to these charges is moot. Defendants' motion for discovery is denied.

### D. Motion for Discovery of a Jack Shaw Recording

At the hearing, Defendants made a motion for the disclosure by the Government of a recording of Jack Shaw, which they argued was exculpatory. (Hearing Tr. 9:3–9.) The Court ordered the Government to turn over the tape for the Court's review. On March 24, 2010, the Government submitted a letter and a copy of an FBI investigative report of Jack Shaw. The Government "confirmed that there is no recording of Mr. Shaw's interview." The Court has reviewed the report and finds that it is not required to be released by the Government. Therefore, Defendants' motion for discovery of this item is denied.

### III. CONCLUSION

For the foregoing reasons, this Court: (1) grants Defendants' motion to dismiss Counts 1–4 of the Superseding Indictment, (2) denies Defendants' motion to dismiss the Superseding Indictment in its entirety based on an outrageous government conduct defense, (3) denies Defendants' motion for discovery of the grand jury proceedings, and (4) denies Defendants' motion for discovery of the Jack Shaw recording. An appropriate Order accompanies this Opinion.